KARLA D. ROSA ET AL. *v.* LAWRENCE
AND MEMORIAL HOSPITAL ET AL.
(AC 34235)

Robinson, Keller and Bishop, Js.

Argued May 15—officially released August 27, 2013

*Daniel J. Klau*, with whom was *Robert J. Cooney*, for the appellant (defendant Anesthesia Associates of New London, P.C.).

*Alinor C. Sterling*, with whom, on the brief, were *William M. Bloss* and *Sean K. McElligott*, for the appellees (plaintiffs).

*Opinion*

KELLER, J. In this medical malpractice action, the defendant Anesthesia Associates of New London, P.C.,[1] brings an amended appeal from the judgment of the trial court, rendered following a jury trial, awarding money damages to the plaintiffs, Karla D. Rosa and

[1] The plaintiffs, Karla D. Rosa and Delmar Rosa, brought this action against Lawrence and Memorial Hospital, Anesthesia Associates of New London, P.C., and Thomas Miett, an anesthesiologist employed by Anesthesia Associates, P.C. Prior to trial, the plaintiffs withdrew their claims against Lawrence and Memorial Hospital. The jury returned a verdict in favor of Miett, from which the plaintiffs have not appealed. In this opinion, we refer to Anesthesia Associates of New London, P.C., the only defendant against whom judgment was rendered and the only defendant involved in this appeal, as the defendant.

Delmar Rosa.[2] The defendant claims that the court improperly (1) admitted into evidence a manufacturer's instruction manual (manual) for an anesthesia device; (2) declined to deliver a limiting instruction related to the jury's permissible use of the manual; (3) declined to grant the defendant a new trial on the ground that the plaintiffs failed to present legally sufficient expert opinion on the issue of proximate cause; and (4) declined to order a new trial or a remittitur on the ground that the jury's verdict was excessive as a matter of law. We dismiss the defendant's original appeal and, with regard to the defendant's amended appeal, we affirm the judgment of the trial court.

The following facts and procedural history underlie this appeal. In count one of the plaintiffs' operative complaint, they alleged that, on or about March 27, 2006, the defendant provided anesthesia and related services to the plaintiff. The plaintiffs alleged that, in a variety of ways, the defendant failed to exercise reasonable care in providing these services[3] and that its

---

[2] In this opinion, references to the plaintiff are to Karla D. Rosa, and references to the plaintiffs are to both Rosas.

[3] The plaintiffs alleged negligence in that the defendant:

"a. did not adequately, properly and accurately assess [the] plaintiff preoperatively for anesthesia purposes;

"b. did not preoperatively formulate a plan for appropriate airway protection of [the] plaintiff in the event of conversion to general anesthesia;

"c. did not adequately, properly and accurately perform a risk assessment of the plaintiff's co-morbidities and overall risk for anesthesia purposes;

"d. did not adequately and properly assess the plaintiff for risk of regurgitation and/or aspiration;

"e. did not select a cuffed endotracheal system for the induction and administration of general anesthesia;

"f. improperly selected a laryngeal mask airway system for the induction and administration of general anesthesia;

"g. did not adequately monitor [the] plaintiff for respiratory distress while using a laryngeal mask airway;

"h. improperly delivered paralytic anesthesia to the plaintiff;

"i. did not provide the plaintiff with anesthesia personnel who possessed the requisite knowledge, skill, and experience to adequately and properly care for, treat, diagnose, monitor and supervise the plaintiff; and,

"j. did not promulgate and/or enforce rules, regulations, standards and protocols for the care and treatment of patients such as the plaintiff, KARLA D. ROSA."

carelessness and negligence caused the plaintiff various "serious, severe, painful and permanent injuries,"[4] resulting in a deprivation of her ability to carry on and enjoy life's activities, and financial loss. In count two, Delmar Rosa set forth a loss of consortium claim against the defendant on the basis of the injuries sustained by his wife, the plaintiff.[5] The defendant denied the allegations of negligence and loss of consortium.

On the basis of the evidence presented at trial, the jury reasonably could have found that on March 27, 2006, the plaintiff, a thirty-nine year old morbidly obese patient who suffered from several medical conditions, was scheduled for elective hernia surgery at Lawrence and Memorial Hospital in New London. The defendant provided anesthesia services at the hospital. Prior to surgery, the plaintiff underwent a preoperative examination by Thomas Miett, an anesthesiologist employed by the defendant. Miett approved a monitored anesthesia to be used during the surgery. Jean Richeimer, a certified registered nurse anesthetist employed by the defendant, administered this monitored anesthesia to the plaintiff prior to her surgery. Richeimer recognized that it was not having the desired effect on the plaintiff, so she paged Miett for the purpose of making a change to a general anesthetic. Miett was unavailable at the

---

[4] The complaint alleged the following injuries:

"a. 26 days in a coma;

"b. 29 days in the intensive care unit and 45 days in the [h]ospital including verbal and orthopedic rehabilitation;

"c. critical care neuropathy;

"d. memory loss;

"e. feeding tube;

"f. venous catheter in jugular;

"g. tracheotomy and tracheotomy scar;

"h. pain in feet;

"i. physiological, psychological and neurological sequelae."

[5] Counts three and four of the plaintiffs' complaint set forth claims against Miett.

time of the page, but Bart Calobrisi responded in his stead.[6]

After conferring with Richeimer, Calobrisi approved the use of a laryngeal mask airway device (LMA device) to deliver general anesthesia to the plaintiff. After this device was employed by Richeimer, however, the plaintiff began coughing, and it became apparent that she was in medical distress and was experiencing an oxygen deficiency. Richeimer discontinued use of the LMA device and administered general anesthesia by means of an endotracheal tube. Thereafter, Miett cancelled the plaintiff's surgery, which had not progressed past the anesthesia stage. The plaintiff aspirated stomach acids into her lungs and experienced problems with her airway. As her condition deteriorated, she was placed in an induced coma for twenty-six days and required a variety of treatments, including treatment for acute respiratory distress syndrome. The plaintiff remained hospitalized after she emerged from the coma, and she underwent significant rehabilitation for a variety of physical problems. She sought damages for her injuries as well as for critical care neuropathy, a permanent injury resulting in foot pain.

Essentially, at trial, the plaintiffs attempted to demonstrate that the defendant breached the standard of care by administering general anesthesia to the plaintiff by means of an LMA device rather than by means of an endotracheal tube. The plaintiffs attempted to demonstrate that the standard of care required this course of treatment because the plaintiff's physical condition, specifically, her morbid obesity, created a risk of aspiration, as occurred in this case. The plaintiffs alleged that Miett negligently failed to take steps to ensure that, if general anesthesia became necessary, an endotracheal

---

[6] It is undisputed that Calobrisi, a physician and principal of the defendant, and Richeimer, a nurse and employee of the defendant, died prior to trial.

tube should be utilized. They also alleged that Richeimer and Calobrisi were negligent in not utilizing an endotracheal tube.

On May 12, 2011, the jury returned a verdict against the defendant and in favor of the plaintiffs. The jury completed interrogatories during its deliberations. With regard to the defendant, the jury found that its agents, Richeimer and Calobrisi, were negligent in their treatment of the plaintiff and that their negligence was a substantial factor in causing her injuries and damages. The jury awarded damages for the plaintiff in the amount of $8,541,808.[7] The jury awarded damages for Delmar Rosa in the amount of $2 million. The court accepted the verdict and ordered that it be recorded.

On May 17, 2011, the defendant filed postverdict motions, including a motion to set aside the verdict, a motion for a new trial and a motion to reduce the verdict. In a written decision of December 30, 2011, the court denied all three motions. On January 11, 2012, the defendant filed an appeal from the court's judgment in the plaintiffs' favor. On January 19, 2012, however, the defendant filed a motion for collateral source reduction, asserting that the court had overlooked ruling on that portion of its motion to reduce the verdict in which it sought a collateral source reduction by the amount of certain collateral source payments that the plaintiff had received.[8] On May 16, 2012, the court, having considered this overlooked matter, reduced the verdict by $83,641.77, thereby reducing the plaintiffs' verdict to $10,458,166.23. The defendant filed the present

[7] This amount consisted of $191,808 in economic damages and, by way of noneconomic damages, $1,850,000 for "[p]ain, suffering and loss of enjoyment of life's activities from March 27, 2006 to the verdict date," and $6.5 million for "[f]uture pain, suffering and loss of life's activities."

[8] In denying the motion to reduce the verdict, the court addressed only that portion of the motion in which the defendant sought a reduction in the verdict on the ground that it was excessive.

amended appeal on May 29, 2012.[9] Additional facts will be set forth as necessary.

## I

First, the defendant claims that the court improperly admitted into evidence a manufacturer's instruction manual for an anesthesia device. We disagree.

At trial, the plaintiff presented testimony from Sheldon Deluty, a board certified anesthesiologist who was disclosed as an expert witness with regard to the applicable standard of care, the deviation therefrom in this case, and the cause of the injuries sustained by the plaintiff. Consistent with his pretrial deposition testimony, Deluty opined at trial that it was a deviation from the standard of care for the defendant to use an LMA device in its treatment of the plaintiff because she was morbidly obese. He testified that "the use of an LMA in a morbidly obese patient is contraindicated as a matter of medical practice." The manual at issue was not a subject of the plaintiffs' case-in-chief.[10]

---

[9] The defendant's amended appeal encompasses the rulings raised in its original appeal, but also is taken from the court's order on the collateral source issue. Because the defendant brought its original appeal challenging the judgment rendered on the jury's verdict and the court's orders on the postverdict motions before the court rendered a decision concerning collateral source payments, however, the *original* appeal was not from a final judgment from which an appeal could be taken, and it must be dismissed on that jurisdictional ground. See, e.g., *Smith* v. *Otis Elevator Co.*, 33 Conn. App. 99, 103, 633 A.2d 731 (1993); see *Midland Funding, LLC* v. *Tripp*, 134 Conn. App. 195, 196 n.1, 38 A.3d 221 (2012). Despite the fact that the original appeal was jurisdictionally defective, the present *amended* appeal is properly before us and remains pending because, in accordance with our rules of practice, "the amended appeal . . . was filed from a judgment or order from which an original appeal properly could have been filed. . . ." Practice Book § 61-9.

[10] The defendant disclosed Calobrisi as an expert witness with regard to the standard of care. He was unavailable to testify at trial; see footnote 6 of this opinion; but, by agreement of the parties, a great deal of his deposition testimony was read into the record at trial during the plaintiffs' case-in-chief. The manual was not a subject of his testimony.

During its case-in-chief, the defendant presented evidence concerning the requisite standard of care, and to refute Deluty's opinion related thereto, by means of the testimony of Miett and James D'Amato, an anesthesiologist. During his direct examination, Miett testified that aspiration did not occur in this case and that, on the basis of his training, knowledge and experience, and his knowledge of the standard of care, the decision to use the LMA device in this case to administer general anesthesia was well within the standard of care.

During his cross-examination, Miett testified that there are circumstances in which morbid obesity is a contraindication to the use of an LMA device. Miett stated that he tended "to be conservative and cautious when there's an option." The following colloquy between the plaintiffs' attorney and Miett then occurred:

"Q. Okay. And part of being conservative and cautious is being familiar with the manufacturer's warnings for the devices that you put in patients.

"A. Yes.

"Q. Okay. And you wouldn't want to put a medical device in a patient until you had thoroughly read and understood the manufacturer's warnings with respect to that device.

"A. The manufacturer's warnings and package inserts in drugs are medical/legal material that we rarely consult. We rely more on our expertise and formal training to use the drugs and devices. The package insert in drugs and equipment is the equivalent of 'this beverage is hot, don't spill it on yourself' that comes on the Dunkin' Donuts cup of coffee.

"Q. So, it's obvious things that you shouldn't do.

"A. It's material they put in the package on account of lawyers. . . .

"Q. Do you have cause to unpackage LMAs in your practice?

"A. Yes. The individual LMAs come in a plastic envelope which we open up, and the brand that we use has no written material that falls out. They just have the syringe that you use to inflate it and it has a little packet of what we call goop, water soluble lubricant that you put on it.

"Q. Like anything else that you get. You probably can't get a bathroom plunger without there being an instruction manual inside the packaging.

"A. In this day and age.

"Q. Yes, right. And that's for the lawyers.

"A. (Nods head.)

"Q. Yep, okay. And so when you unpackage an LMA, and I'll just hand [an LMA device and packaging marked as an exhibit for identification] to you, there's sometimes a package insert. Or, why don't you look inside there and tell me what's in there, if that's consistent with what you find when you open an LMA.

"A. No, it's not. I've never seen this package; I've never seen this brand; I've never seen this booklet that has either been placed in here or I've never seen this—

"Q. Okay.

"A. —device."

Thereafter, the plaintiffs' attorney showed Miett an LMA device that Miett had brought with him to court, an LMA device that Miett identified as being manufactured by "The Laryngeal Mask Company Limited."[11] The plaintiffs' attorney presented Miett with what he stated was the instruction manual for the device, which was

---

[11] The record reflects that this LMA device was marked as an identification exhibit.

marked as an identification exhibit. The following collo-
quy occurred:

"Q. Doctor, I'm showing you plaintiffs' exhibit 24,
which is entitled LMA Airway Instruction Manual for
the LMA Unique. Have you seen that document before?

"A. No.

"Q. Is the LMA Unique that's manufactured by the
Laryngeal Mask Company Limited, that's the one you
brought with you today?

"A. I guess so.

"Q. Okay. So, that's the one you use when you're
carefully and skillfully treating your patients.

"A. I've used an LMA just like this, yes.

"Q. And is it your testimony before this jury that
you've never seen the instruction manual for the device
that you use every day in your patients?

"A. I haven't seen this document that you've put in
front of me before.

"Q. Have you seen any instruction manual?

"A. I may have years ago. This is a . . . technology
that came into use during my career, not something
that I learned to use as a resident in training. So, I
wasn't taught to use these things by preceptors like
everything else. We pick this up along the way, the
way surgeons have picked up laparoscopy and that sort
of thing.

"I went to a course many years ago where we were
instructed on—because we became aware that these
were being used more and more and had a number of
advantages. We all went to different courses, probably.
And I went to a course where I learned about it. There
were practicals in how to use them, and then I have

been using it in clinical work ever since and reading about it in journals and that sort of thing. So, it wasn't something that I was trained on originally because it's newer than twenty-five years ago. So, that probably is the reason I don't recall reading . . . this instruction manual. It's copyrighted 2005. I have been using these since the late '90s."

Thereafter, the plaintiffs' attorney presented Miett with an instruction manual that he represented was copyrighted in 2001. The following questioning occurred:

"Q. . . . [I]s there a date on that manual?

"A. I think—yes.

"Q. That looks like the one from 2001.

"A. Yes.

"Q. And that would have been maybe closer to when you might have been learning how to use the LMA.

"A. I'd have to think about it. I think I went to the course that I told you about in my deposition in probably the late '90s. That was at UVM.

"Q. But do you recognize that manual as one that you might have reviewed at any time?

"A. I'm sorry, I don't recognize it."

The plaintiffs' attorney asked Miett if he had ever looked at the current manual, available online, for the LMA device. Miett testified that he had not looked at that manual. In summary, Miett testified that he was not familiar with any manufacturer's warnings in any LMA device manual.

The plaintiffs' attorney continued to explore the subject of the manual. The plaintiffs' attorney asked Miett

if a company seeking approval by the federal government for the sale of medical devices had to demonstrate that such devices were safe and effective. Miett answered affirmatively. The plaintiffs' attorney asked whether "the manufacturer would know a heck of a lot about the safe and effective use of its products from having gone through that process." Miett answered affirmatively. In response to further questioning, Miett stated that he "guess[ed]" that the teachings of the manufacturer could be expected to be found in their product manual. Then, the plaintiffs' attorney asked Miett whether he would "want to know" if, in the manual, the manufacturer had any warnings concerning its use on morbidly obese patients.

Outside of the presence of the jury, the defendant's attorney objected to what he deemed to be an improper line of questioning on several grounds. The defendant's attorney stated that the questioning was improper because the manufacturer's manual did not establish a standard of care and that there was no evidence that Miett had to have become familiar with the manual to know the standard of care. Also, the defendant's attorney argued that there was no foundation for the line of questioning because there was no evidence that Miett had ever read or used the manual at issue. On this ground, the defendant's attorney argued that the plaintiffs were attempting to challenge Miett's credibility on the basis of something that he had not read.

The court overruled the objection to the line of questioning because the LMA manuals about which the witness was being questioned "relate[d] to devices that [Miett] brought into court . . . ." Subsequently, at the direction of the plaintiffs' attorney and in the presence of the jury, Miett read aloud from a portion of the manual, a contraindication concerning the use of the LMA device in grossly or morbidly obese persons.

Thereafter, outside the presence of the jury, the defendant's attorney objected on the grounds that the plaintiffs' attorney improperly elicited testimony from a document that was not in evidence, that the contraindication in the manual was not relevant to the present case, that Miett testified that he had never seen or read this manual, and that the manual could not establish a standard of care for a board certified anesthesiologist. The plaintiffs' attorney stated that the manual was relevant evidence with regard to the standard of care and asked the court to instruct the jury that it could consider the evidence for that purpose.

The court admitted a portion of the manual into evidence, specifically, the table of contents and the portion of the manual that set forth contraindications for the LMA device.[12] The court admitted the manual for a limited purpose, related to assessing the witness' credibility, and so instructed the jury. During later examination of Miett, the plaintiffs' attorney explored a line of questioning that was directly related to the contraindication set forth in the manual. Referring to the language in the manual, he elicited testimony from Miett that there was evidence that regurgitation occurred during the plaintiff's procedure,[13] the LMA device was being used as a substitute for an endotracheal tube, the plaintiff's surgery was elective in nature and the plaintiff was morbidly obese on March 27, 2006, the date that the procedure took place. During later examination, Miett testified that, as of the date of trial, he would not consider reading the LMA manual for guidance in treating

[12] Under the portion of the manual entitled "CONTRAINDICATIONS," the exhibit provides in relevant part: "Due to the potential risk of regurgitation and aspiration, do not use the LMA airway as a substitute for an endotracheal tube in the following elective or difficult airway patients on a non-emergency pathway . . . Patients who are grossly or morbidly obese . . . ."

[13] During his cross-examination, Miett testified that he disagreed with the opinions of other witnesses that aspiration occurred during the plaintiff's procedure.

patients. One of the clear themes of the plaintiffs' cross-examination of Miett concerned his decision not to familiarize himself with and to heed the contraindications in the manual and whether, with regard to his treatment of morbidly obese patients such as the plaintiff, such practice with regard to the manual exposed his patients to an unnecessary risk.

The defendant called D'Amato, its expert witness, subsequent to Miett. In the course of his testimony during the defendant's case-in-chief, D'Amato opined that, in light of the facts of the present case, "the use of the LMA once the decision was made to proceed to general anesthesia was very appropriate" and was consistent with his clinical practice. He testified that such a practice, in light of the facts of the present case, was not a deviation from the standard of care that existed on March 27, 2006. His opinions were based on his training, knowledge and expertise, and his knowledge of the standard of care.

The defendant's attorney asked D'Amato whether he had performed any "website research of the manufacturer of the LMA device" in preparing for his pretrial deposition testimony in this case. D'Amato testified that he had and that, in relevant part, the LMA of North America website stated that "LMA airways are contraindicated in elective surgeries where the patients . . . are not fasted or where fasting cannot be confirmed . . . patients who may have retained gastric contents and . . . patients who have fixed, decreased pulmonary compliance." D'Amato testified that none of these three contraindications pertained to the plaintiff in the present case.

Further, D'Amato testified on the basis of his training, knowledge and experience as a board certified anesthesiologist that manufacturers' materials do not establish a standard of care for using a particular device. He went

on to explain in detail many clinical circumstances in which it is more advantageous to employ an LMA device rather than an endotracheal tube, despite manufacturers' warnings to the contrary.

During cross-examination of D'Amato, the plaintiff's attorney elicited testimony that, during his deposition testimony, he stated that the only source of material or authority that he used to formulate his expert opinion concerning the standard of care was "the website for the LMA company," which he had discussed during direct examination. Through additional questioning by the plaintiff's attorney, however, D'Amato acknowledged that the website directed the user to refer to the product manual for the LMA device "for information on indications, contraindications, warnings, and precautions or information on which LMA airways are best suited for different clinical situations" but that he had not used the website to review such manual.[14] Essentially, D'Amato testified that, in his deposition testimony, he discussed information found on the manufacturer's website, but he did not review or discuss the contraindications set forth in the LMA device manual, which could be accessed by means of a link on the website. He acknowledged that there were contraindications in the manual and that one of the contraindications in the manual refers to the use of the LMA device in elective, nonemergency cases in which patients are morbidly obese. D'Amato testified that, although he had used the website as "a reference," "[t]he manual is not how I conduct anesthesia." D'Amato testified that he has seen the manuals for the device "many times over the years," but that his opinions on the standard of care were not informed by the

[14] The court overruled an objection by the defendant's attorney with regard to D'Amato's reading from website content, which was not in evidence. The court reasoned that because D'Amato relied on such information in forming his opinion, it was a proper subject of cross-examination.

manufacturer's website or the manuals, but were based on his twenty years of clinical experience and practice. Later, the plaintiffs' attorney concluded a line of questioning about the contraindication in the manual by asking D'Amato whether "this contraindication fits this case like a glove?" D'Amato replied in the negative.

The defendant raises three arguments in connection with this claim concerning the admissibility of the manufacturer's manual. It argues that the court improperly admitted the manual because (1) the manual was not properly authenticated; (2) the plaintiffs did not produce the manual during discovery, failed to pre-mark it as an exhibit, and "surprised Dr. Miett with it during his cross-examination"; and (3) the manual was inadmissible hearsay. We will address each aspect of the claim in turn.

"The trial court's ruling on the admissibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence . . . [and its] ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . Moreover, evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the [appellant] of substantial prejudice or injustice. . . .

"[E]ven if a court has acted improperly in connection with the introduction of evidence, reversal of a judgment is not necessarily mandated because there must not only be an evidentiary [impropriety], there also must be harm. . . . The harmless [impropriety] standard in a civil case is whether the improper ruling would likely affect the result. . . . When judging the likely effect of

such a trial court ruling, the reviewing court is constrained to make its determination on the basis of the printed record before it. . . . Thus, our analysis includes a review of: (1) the relationship of the improper evidence to the central issues in the case, particularly as highlighted by the parties' summations; (2) whether the trial court took any measures, such as corrective instructions, that might mitigate the effect of the evidentiary impropriety; and (3) whether the improperly admitted evidence is merely cumulative of other validly admitted testimony. . . . It is the [appellant's] burden to show harmful error." (Citations omitted; internal quotation marks omitted.) *Quaranta* v. *King*, 133 Conn. App. 565, 567–69, 36 A.3d 264 (2012).

## A

The first argument raised in connection with this claim is that, during Miett's cross-examination, the court improperly admitted the excerpts from the manufacturer's manual for the LMA device absent proper authentication by the proffering party, the plaintiffs. As it did at trial, the defendant asserts that admission of the manual was improper because Miett testified that he had never seen the manual. We agree that the court improperly admitted the exhibit because it was not properly authenticated, but conclude that the court's error was harmless.

There is no argument or basis upon which to conclude that the manual at issue was self-authenticating. Section 9-1 (a) of the Connecticut Code of Evidence provides: "The requirement of authentication as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the offered evidence is what the proponent claims it to be." The commentary to § 9-1 provides that the requirement of authentication applies to all types of evidence, including writings, and that "[e]vidence may be authenticated in a variety of

ways." Conn. Code Evid. § 9-1 (a), commentary. By way of example, the commentary to § 9-1 provides that "[a] witness with personal knowledge may testify that the offered evidence is what its proponent claims it to be." Conn. Code Evid. § 9-1 (a) (1), commentary. "It is well established that [a]uthentication is . . . a necessary preliminary to the introduction of most writings in evidence . . . . In general, a writing may be authenticated by a number of methods, including direct testimony or circumstantial evidence. . . . Both courts and commentators have noted that the showing of authenticity is not on a par with the more technical evidentiary rules that govern admissibility, such as hearsay exceptions, competency and privilege. . . . Rather, there need only be a prima facie showing of authenticity to the court. . . . Once a prima facie showing of authorship is made to the court, the evidence, as long as it is otherwise admissible, goes to the jury, which will ultimately determine its authenticity." (Internal quotation marks omitted.) *State* v. *Garcia*, 299 Conn. 39, 57–58, 7 A.3d 355 (2010).

The plaintiffs argue that the manual was sufficiently authenticated by means of Miett's testimony. In support of this argument, the plaintiffs assert that "the trial court had reason to believe that Dr. Miett was familiar with the LMA Unique manual—he had testified that part of being careful in providing medical care is being familiar with manufacturer's warnings for the devices used in patients. . . . He also brought an LMA Unique with him to trial and admitted seeing the manual for the LMA Unique in a training course on the LMA years previously." (Citation omitted; emphasis omitted.) Also, the plaintiff argues that Miett testified that he stated that he recognized the manual admitted into evidence.

A fair and careful assessment of Miett's testimony reveals that he did not affirmatively testify that he had any familiarity with the manual admitted into evidence.

As set forth previously in this opinion, the plaintiffs' attorney repeatedly asked Miett about his recognition of the manual at issue. Repeatedly, Miett testified that he did not recognize the writing and that, in fact, he had never seen the writing before it was presented to him at trial. The plaintiff accurately refers to the fact that Miett brought an LMA device with him to court and that he agreed with the assertion of the plaintiffs' attorney that "part of being conservative and cautious is being familiar with the manufacturer's warnings for the devices that you put in patients." This evidence, however, did not support a finding that the writing at issue was what the proponent claimed it to be, namely, a manufacturer's manual for an LMA device. As such, the exhibit was not properly authenticated and it was improper for the court to admit it into evidence.

Turning to an evaluation of whether the court's erroneous evidentiary ruling was harmful, we readily conclude that the improperly admitted manual was cumulative of other validly admitted testimony concerning the manufacturer's warnings in the manual.[15] The only aspect of the manual that was germane to the present case was the contraindication regarding the use of the LMA device on morbidly obese patients in elective, nonemergency cases. As set forth previously, however, D'Amato testified about the weight he afforded information about the LMA device provided by its manufacturer, but also testified that the manufacturer included this particular contraindication in its manual. It cannot be disputed that D'Amato's testimony concerning the content of the manual, *admitted without objection or limitation as to its use*, was duplicative of the evidence that the court admitted improperly,

---

[15] As set forth previously, D'Amato acknowledged in his trial testimony that, during his deposition testimony, he testified that in determining the standard of care he primarily referred to the information on the manufacturer's website.

namely, the contraindication appearing in the manual. In light of this determination, we are not persuaded by the defendant's argument that the ruling at issue was harmful.

## B

Additionally, as set forth previously, the defendant claims that the court improperly admitted the manual because (1) the plaintiffs did not produce the manual during discovery, failed to pre-mark it as an exhibit, and "surprised Dr. Miett with it during his cross-examination"; and (2) the manual was inadmissible hearsay. In part I A of this opinion, we held that the improper admission of the manual was harmless under the circumstances of the present case. Having determined that the improper admission of the manual was harmless under the circumstances of this case, we need not address the merits of these additional aspects of the defendant's claim, for our harmfulness analysis necessarily governs any claim of error related to the admissibility of the manual.[16]

## II

Next, the defendant claims that after the court delivered its charge, it improperly declined to deliver a limiting instruction related to the jury's use of the manual. We disagree.

In part I A of this opinion, we set forth the facts surrounding the admission of the manual during Miett's cross-examination. At the time that the court admitted portions of the manual into evidence, it delivered the following limiting instruction to the jury concerning the exhibit: "I have overruled [the defendant's attorney's]

---

[16] The plaintiffs assert that these aspects of the defendant's claim are unpreserved and, thus, are unreviewable. Because we do not reach the merits of these aspects of the defendant's claim, we need not resolve these reviewability issues.

objections, and several pages of the manufacturer's manual will be marked as exhibit 24. The cover, the table of contents and the page regarding the contraindications. Now, what I want to do is to give you a cautionary instruction. In this case, one of the first issues you'll have to deal with is . . . the standard of care that's applicable to the procedures that were performed. The standard of care in this case was established by the testimony of expert witnesses. You have heard Dr. Deluty, you've heard and are in the process of hearing testimony from Dr. Miett, and you will hear some additional testimony from Dr. D'Amato with regard to the standard of care . . . for an anesthesiologist. . . . And Dr. Calobrisi. . . . This manufacturer's manual may be used with regard to the issue of the credibility of the experts. It's not—in and of itself does not establish the standard of care." The defendant did not object to this limiting instruction.

Following closing arguments, the court delivered its charge to the jury. During its charge, the court did not make a specific reference to the manual. The court, however, instructed the jury, in relevant part: "If I admitted an item or allowed an answer to a question for a limited purpose only, you may consider it as evidence for that limited purpose and for no other purpose."

Following the charge, outside of the presence of the jury, the court asked counsel if there were any exceptions to its charge. The following colloquy between the defendant's attorney and the court occurred:

"[The Defendant's Attorney]: . . . I have one. I think there should be a limiting or a cautionary instruction on the standard of care that the manufacturer's manual cannot be used in determining the standard of care. You gave them a cautionary instruction when it went into evidence.

"The Court: Well, I did reference . . . that in my description of what evidence is and for the limited purpose.

"[The Defendant's Attorney]: You did.

"The Court: So, I think that would cover that.

"[The Defendant's Attorney]: Fine. I just thought I'd say it anyhow to show that I was awake.

"The Court: There's never been any doubt in my mind . . . .

"[The Defendant's Attorney]: Thank you, Your Honor."

On appeal, the defendant asserts that the court's refusal to deliver a limiting instruction constituted reversible error. In summary fashion, the defendant asserts that its request was reasonable and that the court's general reminder to follow any limiting instructions given during the trial was inadequate because, during his closing argument, the plaintiffs' attorney improperly invited the jury to consider the manual as evidence of the standard of care, not for the purpose of assessing the credibility of the defendant's expert witnesses. The defendant also asserts that the plaintiffs throughout the case suggested to the jury that the manual could be used in such a manner.

We will review the defendant's claim because, although the defendant failed to cover the matter by means of a written request to charge prior to the time that the court delivered its charge, it took a timely exception to the court's charge on this ground. See Practice Book § 16-20. "Our standard of review concerning claims of instructional error is well settled. [J]ury instructions must be read as a whole and . . . are not to be judged in artificial isolation from the overall charge. . . . The whole charge must be considered

from the standpoint of its effect on the jurors in guiding them to a proper verdict . . . . The trial court must adapt its instructions to the issues raised in order to give the jury reasonable guidance in reaching a verdict and not mislead them. . . . Claims of error addressed to the [jury] charge are tested by the pleadings and by the evidence . . . . The court has a duty to submit to the jury no issue upon which the evidence would not reasonably support a finding. . . . The court should, however, submit to the jury all issues as outlined by the pleadings and as reasonably supported by the evidence." (Internal quotation marks omitted.) *Kosiorek* v. *Smigelski*, 138 Conn. App. 695, 717, 54 A.3d 564 (2012), cert. denied, 308 Conn. 901, 60 A.3d 287 (2013).

We begin our analysis by clarifying what is not before us. In its analysis of this claim of instructional error, the defendant asserts that the court improperly admitted the manual for the purpose of assessing the credibility of its expert witnesses and that the plaintiffs relied on the manual for the purpose of establishing the standard of care. In part I of this opinion, we considered the defendant's claim related to the admissibility of the manual and will not revisit the issue here. Additionally, the defendant, in this appeal, does not raise any claim of error on the part of the court with regard to the closing argument of the plaintiffs.

The court admitted portions of the manual for a limited purpose, to assess the credibility of the expert witnesses. At the time of its ruling, it delivered a limiting instruction in which it explicitly stated that the standard of care was a central issue in the case and that such standard was established by the testimony of the expert witnesses, specifically, Deluty, Miett, D'Amato, and Calobrisi. The court stated that, in and of itself, the manual did not establish the standard of care. The defendant's attorney did not object to the court's limiting instruction at the time it was given. Following the

court's charge, the defendant did not state that the court's previous limiting instruction was inadequate, but requested that the court merely reiterate that limiting instruction. As the colloquy set forth previously reflects, the defendant did not provide *any* rationale for this request and responded somewhat casually to the court's denial of it.

Essentially, the defendant argues that, following the closing argument by the plaintiffs' attorney, it was likely that the court's charge was inadequate, that the jury was misled, and that the jury improperly relied on the manual to establish the standard of care. For several reasons, we reject the claim that the court's instruction did not accurately guide the jury to a proper verdict. As set forth previously, the court delivered a limiting instruction at the time that it admitted portions of the manual and, in its charge, instructed the jury to follow the limiting instructions that were given during the trial. In addition to the reference to its previous limiting instructions, the court instructed the jury that its verdict must be based on the evidence and that the court's instructions were controlling. The court stated: "[T]he statements by lawyers, including statements made in both their opening statements and in their closing arguments, are not evidence."

The court instructed the jury that liability must be based on a breach of the prevailing professional standard of care. Then, the court stated: "In this case Dr. Deluty, Dr. D'Amato, Dr. Miett, and Dr. Calobrisi, through his deposition, have testified and given you their opinion with regard to the standard of care to be used in measuring the conduct of the defendants on March 27, 2006."

Later, the court stated: "As I've already mentioned, the plaintiff has the burden of proving by a fair preponderance of the evidence that the defendants' conduct

represented a breach or a departure from the prevailing standard of care. Under our law, the plaintiff must prove this by expert testimony.

"In this case, she offered the testimony of Dr. Sheldon Deluty on the issue of the standard of care and that there was a deviation from the standard of care by Dr. Miett, Dr. Calobrisi and Nurse Richeimer.[17] The defendants offered the testimony of Dr. James D'Amato, Dr. Thomas Miett, and Dr. Bart Calobrisi as to the standard of care and that there was no deviation from the standard of care.

"Although you are not bound by the opinion of any of the experts, you are not at liberty to conclude that the defendants were negligent if it was not supported by expert testimony."

In light of the foregoing, we are persuaded that the court's charge was not likely to have misled the jury in the manner suggested by the defendant.[18] The court

---

[17] Although the testimony did not concern the manual, we note that there was ample testimony from Deluty that the use of an LMA device was contraindicated in the plaintiff's case due to her obesity.

[18] We do not assess the court's charge in a vacuum, but in the context of the central issues of the trial as well as the arguments advanced before the jury. "[T]he test of a court's charge is . . . whether it fairly presents the case to the jury in such a way that injustice is not done to either party . . . . In this inquiry, we focus on the substance of the charge rather than the form of what was said not only in light of the entire charge, but also within *the context of the entire trial.*" (Emphasis added; internal quotation marks omitted.) *State* v. *Ward*, 306 Conn. 698, 717, 52 A.3d 591 (2012). Thus, we are mindful that the closing argument of the defendant's attorney repeatedly emphasized that the manual was not evidence of the standard of care in this case. The defendant's attorney argued in relevant part: "Dr. Miett explained to you that they have a system—which is well within the standard of care and it's not in some manufacturer's handbook, which does not determine the standard of care—that they have backup redundancy [in terms of supervising multiple operating rooms]."

Later, the defendant's attorney argued in relevant part: "[I]n order to find Dr. Miett negligent, you have to find what the standard of care was, and it's not found in a manufacturer's handbook. When that book—pages were marked in evidence, the court gave you a charge that it was only being admitted for the purpose of an inconsistency allegedly in the testimony of

admitted the manual for a limited purpose. "The jury is presumed to follow the court's instructions absent a clear indication to the contrary." (Internal quotation marks omitted.) *State* v. *Ali*, 233 Conn. 403, 424, 660 A.2d 337 (1995). Furthermore, the court's instructions to the jury, viewed as a whole, cannot reasonably be interpreted to suggest that the manual was evidence of the standard of care. As it did in its original limiting instruction, the court referred specifically to *the expert testimony* relevant to a determination of the standard of care. Furthermore, the court sufficiently conveyed to the jury that it must base its verdict on the evidence and that the arguments of counsel were not evidence.

### III

Next, the defendant argues that the court improperly declined to grant the defendant a new trial on the ground that the plaintiffs failed to present legally sufficient expert opinion on the issue of proximate cause. We disagree.

In support of its motions to set aside the verdict and for a new trial, the defendant argued before the trial court that the plaintiffs failed to present expert testimony at trial that the defendant's negligence proximately caused the plaintiff's foot pain, a condition for which the jury awarded the plaintiff $6.5 million for future pain, suffering and loss of life's activities. Consistent with the arguments raised before the trial court,

---

the witness about whether he was aware of the handbook or had read it.

"Board certified anesthesiologists don't establish a standard of care based upon a manufacturer's handbook. It's that simple. It's what similar health care providers in the same specialty do based upon their training, knowledge, and experience, their education, their continuing education, and that's how the standard of care is arrived at."

Thus, to the extent that the closing argument of the plaintiffs' attorney suggested that the manual could be used inconsistently with the limited use for which it was admitted, we are mindful that the defendant's attorney, in argument, directly rebutted such an argument by reference to the court's limiting instruction.

the defendant argues before this court that the expert witness presented by the plaintiffs, neurologist Daniel Moalli, did not satisfy the plaintiff's burden of proof with regard to the cause of the plaintiff's foot pain because he testified that he was unable to determine whether the plaintiff's foot pain was caused by critical care neuropathy, which could have developed as a result of the course of critical care treatment the plaintiff received following the events of March 27, 2006, or diabetic neuropathy, a condition related to the plaintiff's preexisting diabetic condition. The defendant asserts that a reasonable interpretation of Moalli's testimony reveals that he was unable "to separate the two neuropathies as the cause of [the plaintiff's] foot pain." In denying the defendant's postverdict motions, the court stated that the plaintiffs had presented sufficient evidence to support a finding that the defendant's deviation from the standard of care caused the permanent injury at issue.[19]

"Our standard of review of [a claim that the court improperly denied a motion for a new trial] is the abuse of discretion standard. . . . A petition for a new trial is addressed to the discretion of the trial court and will never be granted except upon substantial grounds. As the discretion which the court is called upon to exercise is not an absolute but a legal one, we will upon appeal set aside its action when it appears that there was a misconception on its part as to the limits of its power, that there was error in the proceedings preliminary to the exercise of its discretion, or that there was a clear abuse in its exercise of its discretion." (Internal quotation marks omitted.) *Johnson* v. *Board of Education*, 130 Conn. App. 191, 197, 23 A.3d 68, cert. granted

---

[19] The court stated: "The court has reviewed the transcript of Dr. Moalli's testimony and concludes that the jury could rely upon that testimony and other testimony in the case to come to the conclusion that the plaintiff suffered permanent injuries as a result of the defendant's deviation from the standard of care."

on other grounds, 303 Conn. 907, 32 A.3d 961 (2011). "Appellate review of a trial court's decision granting or denying a motion for a [new trial] must take into account the trial judge's superior opportunity to assess the proceedings over which he or she has personally presided. . . . Thus, [a] motion for a [new trial] is addressed to the sound discretion of the trial court and is not to be granted except on substantial grounds." (Internal quotation marks omitted.) *Pin* v. *Kramer*, 119 Conn. App. 33, 42, 986 A.2d 1101 (2010), aff'd, 304 Conn. 674, 41 A.3d 657 (2012).

"[T]o prevail in a medical malpractice action, the plaintiff must prove (1) the requisite standard of care for treatment, (2) a deviation from that standard of care, and (3) a causal connection between the deviation and the claimed injury. . . . Generally, expert testimony is required to establish both the standard of care to which the defendant is held and the breach of that standard." (Internal quotation marks omitted.) *Jarmie* v. *Troncale*, 306 Conn. 578, 588, 50 A.3d 802 (2012).

Additionally, "[e]xpert medical opinion evidence is usually required to show the cause of an injury or disease because the medical effect on the human system of the infliction of injuries is generally not within the sphere of the common knowledge of the lay person. . . . Expert medical opinion evidence is generally required in all cases involving professional competence and malpractice. . . .

"An exception to the general rule with regard to expert medical opinion evidence is when the medical condition is obvious or common in everyday life. . . . Similarly, expert opinion may not be necessary as to causation of an injury or illness if the plaintiff's evidence creates a probability so strong that a lay jury can form a reasonable belief. . . . Expert opinion may also be

excused in those cases where the professional negligence is so gross as to be clear even to a lay person." (Citations omitted; internal quotation marks omitted.) *Sherman* v. *Bristol Hospital, Inc.*, 79 Conn. App. 78, 88–89, 828 A.2d 1260 (2003); *Poulin* v. *Yasner*, 64 Conn. App. 730, 738, 781 A.2d 422, cert. denied, 258 Conn. 911, 782 A.2d 1245 (2001).

"Although we acknowledge that an expert opinion need not walk us through the precise language of causation, there must be more than mere speculation or conjecture. *State* v. *Nunes*, 260 Conn. 649, 672–73, 800 A.2d 1160 (2002); *Struckman* v. *Burns*, 205 Conn. 542, 554–55, 534 A.2d 888 (1987). To be reasonably probable, a conclusion must be more likely than not. . . . Whether an expert's testimony is expressed in terms of a reasonable probability that an event has occurred does not depend upon the semantics of the expert or his use of any particular term or phrase, but rather, is determined by looking at the entire substance of the expert's testimony. . . . *Struckman* v. *Burns*, supra, 555; see, e.g., *State* v. *Weinberg*, 215 Conn. 231, 245, 575 A.2d 1003 ([a]n expert witness is competent to express an opinion, even though he or she may be unwilling to state a conclusion with absolute certainty, so long as the expert's opinion, if not stated in terms of the certain, is at least stated in terms of the probable, and not merely the possible . . .), cert. denied, 498 U.S. 967, 111 S. Ct. 430, 112 L. Ed. 2d 413 (1990); *Aspiazu* v. *Orgera*, 205 Conn. 623, 632–33, 535 A.2d 338 (1987) ([w]hile we do not believe that it is mandatory to use talismanic words or the particular combination of magical words represented by the phrase reasonable degree of medical certainty [or probability] . . . there is no question that, to be entitled to damages, a plaintiff must establish the necessary causal relationship between the injury and the physical or mental condition that he claims resulted from it . . .)." (Footnote omitted; internal quotation

marks omitted.) *Macchietto* v. *Keggi*, 103 Conn. App. 769, 775–76, 930 A.2d 817, cert. denied, 284 Conn. 934, 935 A.2d 151 (2007).

During their case-in-chief, the plaintiffs presented testimony that the plaintiff suffers from chronic foot pain that interferes with her enjoyment of life. The plaintiffs presented testimony from Moalli, a board certified neurologist who evaluated and treated the plaintiff beginning on July 7, 2006, approximately two months after she was discharged from the hospital. Moalli was experienced in treating patients with critical care neuropathies. Moalli's progress notes from various dates between July 7, 2006, and August 2, 2007, were admitted as a full exhibit. Moalli testified that, in 2006, he diagnosed the plaintiff as having critical care neuropathy related to the twenty-eight days she spent in the intensive care unit. Generally, Moalli testified that a neuropathy manifests itself symptomatically as a loss of feeling or a feeling of numbness or a weakness in muscles and that it is a condition characterized by severe pain. Moalli testified that a critical care neuropathy is damage to a patient's nerves, and that such damage is likely caused by a nutritional deficiency in intensive care patients who are on respirators and being fed intravenously. Moalli testified that the condition can be permanent.

Moalli's progress note dated July 7, 2006, states in relevant part: "The patient is a 39-year-old female who is being followed for critical care neuropathy. The patient was hospitalized on paralytics on a respirator for several weeks. She then was found to have neuropathy and spen[t] time in the rehab unit. Initially she had burning along the lateral aspect of her thighs, in her feet and in her fingertips. The thigh pain is burning in nature. She has her greatest difficulties when she goes to bed at night. She has severe pain in the feet mostly over the dorsum and soles. She takes Neurontin for this. She is becoming more active." Moalli explained

various aspects of this progress note, and testified consistent with the note that his impression, or diagnosis, was "small fiber critical care neuropathy." Moalli testified that there is no treatment for neuropathy and that the only thing he is able to do is prescribe drugs to treat the pain associated with it.

Referring to a later progress note, one dated October 2, 2006, Moalli testified that the plaintiff had complained about carpal tunnel syndrome, which "[p]robably" was related to the critical care neuropathy. Referring to another progress note, one dated November 30, 2006, Moalli testified that the plaintiff had presented with marked pain in her hand that extended from her wrist into her index finger. Again, Moalli testified that the plaintiff was suffering from critical care neuropathy.

Referring to a progress note dated March 26, 2007, Moalli stated that the plaintiff was having difficulty sleeping and was experiencing pain in her hands, feet and hips. The diagnosis on that progress report states, "critical care neuropathy" and "probable diabetic neuropathy . . . ." The plaintiff's attorney asked Moalli to explain this reference to "probable diabetic neuropathy," which was appearing for the first time in his progress notes. Moalli replied: "The patient is diabetic and, basically, she is at risk for nerve damage from the diabetes. I can't separate out the two. There was no evidence of diabetic neuropathy before, but now she's beginning to show increased symptoms, and I was wondering whether or not a combination of the types of neuropathy are giving her a great deal of pain."

Thereafter, Moalli testified concerning a progress note dated May 9, 2007, in which he stated that the plaintiff's critical care neuropathy had been documented by a nerve conduction study performed on her. He testified that the result of the study involving the

plaintiff was that it documented her critical care neuropathy. Moalli testified that, at that time, the plaintiff was experiencing toe spasms that were related to the critical care neuropathy.

The plaintiff's attorney asked Moalli: "[A]t this point, [May 9, 2007] it's more than a year from her stay in the critical care. Are you comfortable at this point saying to a reasonable degree of medical probability that [the plaintiff's] critical care neuropathy is a permanent condition?" Moalli replied affirmatively.

Then, Moalli testified about a progress note dated June 19, 2007, that states in relevant part: "The patient is having more difficulties. She is having extreme pain. The patient has a critical care neuropathy with extreme demyelinization. She is unable to walk more than 30 feet. She is having problems sleeping at night because of extreme burning of her feet." The diagnosis on the progress report stated, "critical care neuropathy, large fiber, demyelinating—small fiber." Moalli testified that the use of the term demyelinization referred to his diagnosis that both large and small nerve fibers were damaged and that "it's a more serious condition." Moalli stated that an inability to walk large distances and burning pain in the feet were consistent with critical care neuropathy. Also, Moalli stated that, at the time of that evaluation, the plaintiff had gained weight because of inactivity and was "miserable because of the discomfort . . . ."

Moalli testified that as of his last evaluation of the plaintiff,[20] on August 2, 2007, she had not experienced an improvement in her symptoms despite the fact that she underwent an intravenous treatment for her neuropathy. He answered affirmatively when the plaintiffs' counsel asked him if his diagnosis at this point was

---

[20] Moalli testified that his relationship with the plaintiff ended at this time because she was relocating from Connecticut to Ohio.

"permanent critical care neuropathy," whether he expected that she would be on pain medication for the rest of her life, and whether such medication "may or may not control the pain she has in her feet."

During his cross-examination, the defendant's attorney asked Moalli: "And you indicated that as far as critical care neuropathy and diabetic neuropathy that you can't separate the two; is that right?" Moalli replied, "Correct." Also, Moalli testified that diabetic neuropathy was a form of nerve damage related to the improper metabolism of sugars and that it does not get better on its own.

On redirect examination, the plaintiff's attorney asked: "Now, you've mentioned that there may be some *amplification effect* from the critical care neuropathy due to the patient's diabetes; is that accurate?" (Emphasis added.) Moalli replied, "Yes." The plaintiff's attorney then asked if it was "a bad thing" to "give" critical care neuropathy to a patient at risk for diabetic neuropathy. Moalli replied, "Yes."

As one aspect of its claim on appeal, the defendant asserts that Moalli's testimony was insufficient to satisfy the element of causation, specifically, that the defendant's negligence caused her claimed permanent injury. On this point, the defendant asserts that Moalli, one of the plaintiff's treating physicians, merely testified concerning the diagnoses he made during the plaintiff's course of treatment that are reflected in her medical records. The defendant asserts that Moalli did not testify that, *based on a reasonable degree of medical probability*, it was his opinion that the plaintiff's foot pain was caused by critical care neuropathy. The defendant raised a multitude of arguments in support of its postverdict motions, yet the defendant has not identified where in the proceedings at trial it advanced such an argument as a basis for granting it relief in the form

of a new trial or where the court addressed such an argument. On the basis of our review of the record, it appears that the plaintiff correctly asserts that such argument is being raised for the first time on appeal.[21] We adhere to the well settled principle that "[t]his court will not review issues of law that are raised for the first time on appeal. . . . We have repeatedly held that this court will not consider claimed errors on the part of the trial court unless it appears on the record that the question was distinctly raised at trial and was ruled upon and decided by the court adversely to the appellant's claim." (Internal quotation marks omitted.) *Weihing* v. *Dodsworth*, 100 Conn. App. 29, 34 n.4, 917 A.2d 53 (2007).

As it did before the trial court, the defendant also argues that the evidence of causation provided by Moalli was insufficient because he conceded in his testimony that he was unable to distinguish between critical care neuropathy and diabetic neuropathy as the cause of the plaintiff's foot pain. A review of Moalli's testimony in its entirety reflects that, from the time that he first began to treat the plaintiff on July 7, 2006, until his last evaluation of her on August 2, 2007, he unequivocally diagnosed her as suffering from critical care neuropathy. He remained committed to that diagnosis at the time of trial. Furthermore, he testified that to "a reasonable degree of medical probability" the plaintiff's critical care neuropathy was permanent in nature.

According to Moalli's testimony, critical care neuropathy is nerve damage that is caused by a patient's stay

[21] With regard to Moalli's testimony, the record reflects that, prior to the court's charge, the defendant argued that the court's charge should reflect the fact that Moalli was unable "to separate the critical care neuropathy from the diabetic neuropathy." Similarly, in its postverdict motions, memoranda of law and argument before the court, the defendant challenged the sufficiency of proof concerning causation on the ground that Moalli was unable to distinguish between critical care neuropathy and diabetic neuropathy as the cause of the plaintiff's foot pain.

in a critical care environment; that is, one cannot be diagnosed with critical care neuropathy unless such neuropathy was caused by critical care. As Moalli testified, the nerve damage found in patients with critical care neuropathy likely is caused by nutritional deficiencies in patients who receive nutrition intravenously. It was not in dispute that the plaintiff was in such a critical care environment for a prolonged period of time.

As set forth previously, Moalli began treating the plaintiff on July 7, 2006, and unequivocally diagnosed her with critical care neuropathy on that date. For the first time, on March 26, 2007, Moalli set forth an additional diagnosis of "probable" diabetic neuropathy, although such diagnosis was not mentioned on future progress reports.[22] Moalli testified that the plaintiff was "at risk for nerve damage" because she was a diabetic, and his testimony reflects that he merely questioned, or "wonder[ed]," whether the plaintiff also suffered from diabetic neuropathy. At no time did Moalli opine that the plaintiff's neuropathy was the result of her diabetic condition, but only that she was "at risk" for such condition. Moalli testified that he was unable to separate the two types of conditions as a cause of pain, but his testimony, viewed as a whole, cannot fairly be interpreted to suggest that he diagnosed the plaintiff with both critical care neuropathy and diabetic neuropathy. His testimony reflects his belief that, generally, it would be impossible to distinguish between the two types of neuropathy in patients that suffer from both conditions. Besides referring to the plaintiff as a patient "at risk" for diabetic neuropathy, Moalli agreed that, generally, diabetic neuropathy may amplify the negative effects of critical care neuropathy.

On the basis of the foregoing analysis, we do not agree that Moalli did not provide sufficient evidence

---

[22] The parties do not point to any evidence in this case that the plaintiff suffered from diabetic neuropathy prior to the events at issue.

that critical care caused a permanent neuropathy in the plaintiff's feet, a condition that results in a significant degree of pain. A fair interpretation of Moalli's testimony leads us to reject the defendant's claim. Accordingly, we do not agree that the court's denial of the defendant's motion for a new trial constituted an abuse of its discretion.

## IV

Last, the defendant argues that the court improperly denied its motion for a new trial or, in the alternative, its motion for a remittitur on the ground that the jury's verdict as to both plaintiffs was "excessive as a matter of law." We disagree.

In part III of this opinion, we set forth the standard of review applicable to a court's ruling on a motion for a new trial. Similarly, the standard of review that we employ in reviewing a court's decision denying a motion for a remittitur affords the court discretion in considering the motion: "General Statutes § 52-216a provides in relevant part: If the court at the conclusion of the trial concludes that the verdict is excessive as a matter of law, it shall order a remittitur and, upon failure of the party so ordered to remit the amount ordered by the court, it shall set aside the verdict and order a new trial. . . . Our Supreme Court repeatedly [has] stated that the award of damages, in particular, is a matter peculiarly within the province of the trier of facts. . . . For that reason, we consistently have held that a court should exercise its authority to order a remittitur rarely—only in the most exceptional of circumstances. . . .

"In determining whether to order remittitur, the trial court is required to review the evidence in the light most favorable to sustaining the verdict. . . . Upon completing that review, the court should not interfere with the jury's determination except when the verdict

is plainly excessive or exorbitant. . . . The ultimate test which must be applied to the verdict by the trial court is whether the jury's award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury [was] influenced by partiality, prejudice, mistake or corruption. . . . The court's broad power to order a remittitur should be exercised only when it is manifest that the jury [has] included items of damage which are contrary to law, not supported by proof, or contrary to the court's explicit and unchallenged instructions. . . .

"[T]he decision whether to reduce a jury verdict because it is excessive as a matter of law [within the meaning of § 52-216a] rests solely within the discretion of the trial court. . . . [Consequently], the proper standard of review of a trial court's decision to grant or deny a motion to set aside a verdict as excessive as a matter of law is that of an abuse of discretion. . . . Accordingly, the ruling of the trial court on the motion to set aside the verdict as excessive is entitled to great weight and every reasonable presumption should be given in favor of its correctness." (Internal quotation marks omitted.) *Lappostato* v. *Terk*, 143 Conn. App. 384, 405–406, 71 A.3d 552 (2013).

The defendant asserts that two facts, considered together, support its conclusion that the verdict was excessive as a matter of law. First, the noneconomic damages awarded to the plaintiff exceeded the $3 million award of noneconomic damages (for the plaintiff's pain and suffering) suggested by the plaintiffs' attorney during closing argument. Second, the jury found in favor of Miett and against the defendant. The defendant asserts that "the record compels . . . the inference . . . that the jury decided to place the blame for [the plaintiff's] injuries on the two unnamed defendants, Dr. Calobrisi and Nurse Richeimer, because they happened

to have died before trial. Their deaths were convenient events which made it possible for the jury to award [the plaintiffs] substantial damages without actually blaming the only living defendant, Dr. Miett. The split verdict is not evidence that the jurors followed the law; it is evidence that they let their emotions and other improper considerations dictate the verdict." (Emphasis omitted.)

In rejecting the defendant's postverdict motions, the court, having set forth the correct legal principles, stated in relevant part: "The defendant, through its motion, asks the court to substitute its judgment as to the amount of fair, just and reasonable compensatory damages to be awarded to the plaintiffs. The awarding of compensatory damages for personal injury is not reducible to a formula and cannot be measured with exactitude. It argues that this verdict must shock the judicial conscience. There is no extrinsic evidence that the defendant points to or that is observable by the court that would indicate that this jury has acted against the rule of law, or suffered their passions, prejudices or perverse disregard of justice. In this case the jury rendered a split verdict. They rendered a defendant's verdict for the attending anesthesiologist, Dr. Thomas Miett. This was so, even though the plaintiff's expert testified that Dr. Miett's care had deviated from the standard of care. This split verdict leads the court to the conclusion that the jury followed the court's instructions, evaluated the evidence as between either of the defendants and was conscientious in the discharge of their responsibilities.

"There is no doubt that this is a large verdict and in excess of the amount argued for by the plaintiffs' counsel. No case has been cited by counsel that holds that a jury verdict in excess of what a plaintiff's attorney argues for is excessive per se. The jury had before it evidence [of] the permanent injuries suffered by the

plaintiff as a result of the defendant's malpractice and that these injuries were painful and limited the plaintiff in her activities of daily living. There was further evidence of the impact of these injuries on the plaintiff's spouse. The court declines to substitute its judgment for that of the jury in this case. The jury's verdicts, in favor of one defendant and against the other defendant, do not shock the court's conscience."

We begin our analysis of the jury's damage award mindful that there was ample evidence that the plaintiff experienced substantial pain and suffering and that she would continue to experience pain and suffering in the future. The evidence demonstrated that the plaintiff was in a coma for twenty-six days, during which time she was unable to care for herself in any way. After she emerged from the coma, the plaintiff remained hospitalized and was unable to carry out or enjoy many of the basic activities of life; she experienced a host of physical and mental issues such as issues with walking, speaking and remembering loved ones. During a prolonged course of therapy, she relearned tasks that she otherwise took for granted prior to the events of March 27, 2006. Additionally, there was ample evidence of the debilitating nature of the plaintiff's permanent critical care neuropathy and evidence that, at the time of trial, the plaintiff had an additional life expectancy of 37.6 years. On the basis of the evidence, it was reasonable for the jury to find that these physical limitations negatively affected the plaintiff emotionally. This evidence concerning the plaintiff's injuries readily supports a finding that Delmar Rosa suffered significant anguish due to the loss of consortium of the plaintiff, his wife.

Accordingly, on the basis of our thorough review of the record, we conclude that the court's analysis of the jury's damage award is sound. As the court observed, although the plaintiffs' attorney suggested an award of damages during argument before the jury, the award

of damages was particularly within the province of the jury and the jury was free to disregard that suggestion and craft a larger award.

Furthermore, the defendant's attempt to explain the jury's damage award, as necessarily having been influenced by the deaths of Calobrisi and Richeimer, amounts to pure speculation. Affording every reasonable presumption in favor of the correctness of the verdict, as we must, we readily conclude that the verdict in favor of Miett is justified on the ground that, although the plaintiffs attempted to prove that Calobrisi, Richeimer and Miett had acted negligently, Miett's conduct was wholly distinct from that of Calobrisi and Richeimer. Certainly, it was the jury's obligation to consider independently the conduct of each and every party against whom this action was brought. There is no support for the defendant's argument that the verdict returned by the jury was influenced by the deaths of Calobrisi and Richeimer or that the verdict was not the product of a proper evaluation of the evidence.

Consistent with the foregoing analysis, we conclude that the court's decisions in denying the motion for a new trial and in denying the motion for a remittitur did not reflect an abuse of discretion, and that the jury's damages award fell within the limits of fair, just and reasonable compensation for the plaintiffs' injuries. Accordingly, we reject the defendant's claim.

The defendant's original appeal is dismissed; the judgment is affirmed with respect to the defendant's amended appeal.

In this opinion the other judges concurred.