******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# BRUCE COCKAYNE ET AL. *v.* THE BRISTOL HOSPITAL INCORPORATED ET AL.
## (AC 44241)

Prescott, Alexander and Bishop, Js.

*Syllabus*

The plaintiffs, B and his wife, sought to recover damages from the defendant hospital for, inter alia, injuries B allegedly sustained while he was receiving treatment from the defendant's employees. Over a three day period, two of the defendant's nurses, K and L, administered medication to B rectally via enema a total of three times. On the day following the final administration, a physician discovered that B's rectum had been perforated. As a result, B developed a necrotizing infection and sepsis, his health deteriorated, and he required multiple medical procedures. At trial, after the plaintiffs had rested, the defendant moved for a directed verdict, claiming that the plaintiffs had failed to present an evidentiary basis as to when the perforation occurred, which of the defendant's employees had breached the applicable standard of care, and whether the tip of the enema was capable of causing the perforation. The trial court reserved its decision on the motion and permitted the issues to be submitted to the jury. The jury returned a verdict in favor of the plaintiffs and the defendant filed motions for judgment notwithstanding the verdict and to set aside the verdict. The trial court denied both motions and the defendant appealed to this court. *Held*:

1. The trial court properly denied the defendant's motion for judgment notwithstanding the verdict: this court, determining that the issue was subject to plenary review because the question of whether the evidence was sufficient to withstand the motion was one of law, concluded that the plaintiffs had met their burden of producing sufficient evidence for the jury to find that the enema was physically capable of causing the perforation, as an expert testified regarding the average length of the anal canal and the length of the tip of the enema, stating that it could reach into the rectum and that it was possible for the tip to go through the rectum and cause the perforation suffered by B; moreover, the defendant did not provide any authority for its assertion that the plaintiffs needed to provide specific evidence regarding B's actual anatomical measurements, and the experts were not required to disprove all other possible explanations for the injury but only needed to show that their opinions were based on reasonable probabilities; furthermore, the use of a differential diagnosis was proper and sufficient to establish the plaintiffs' theory of causation, namely, that the defendant's employees caused the perforation suffered by B, as the jury heard evidence that there was no perforation of B's rectum prior to his hospitalization, that the most likely cause of the perforation was the insertion of a foreign object, and that, although there were four possible causation events, an expert witness used differential diagnosis to eliminate three of the potential causes and opined that, to a reasonable degree of medical probability, an enema administered during B's hospitalization caused the perforation, and this court and our Supreme Court have indicated that a causal relationship between an injury and its later physical effects may be established by a physician's deduction through the process of eliminating other causes.

2. The trial court properly denied the motion to set aside the verdict, as the defendant could not prevail on its claim that the jury improperly was permitted to consider a theory of negligence unsupported by the evidence: the plaintiffs presented sufficient expert evidence for the jury to find that L caused the perforation of B's rectum, as L administered an enema during the time frame in which the perforation likely occurred, an expert physician testified that the perforation was caused by the administration of an enema with excessive force and indicated that one of the nurses had caused it, and a registered nurse, one of the plaintiffs' experts, testified that K or L had used improper technique in administering the enemas and indicated that L had caused the perforation, although she later clarified her statement to indicate that she could not determine

which individual nurse bore sole responsibility for causing the perforation.

Argued May 24, 2021—officially released February 8, 2022

*Procedural History*

Action to recover damages for medical malpractice, and for other relief, brought to the Superior Court in the judicial district of New Britain, where the matter was tried to the jury before *Morgan, J.*; verdict for the plaintiffs; thereafter, the court, *Morgan, J.*, denied the defendants' motions for judgment notwithstanding the verdict and to set aside the verdict and rendered judgment in accordance with the verdict, from which the defendants appealed to this court. *Affirmed.*

*Tadhg Dooley*, with whom were *Jeffrey R. Babbin* and, on the brief, *Michael G. Rigg*, for the appellants (defendants).

*Jack G. Steigelfest*, with whom were *Thomas P. Cella* and, on the brief, *Brian D. Danforth*, for the appellees (plaintiffs).

*Opinion*

ALEXANDER, J. The dispositive issue in this appeal is whether the plaintiffs, Bruce Cockayne and Marion Cockayne, presented sufficient evidence in support of their claim of medical malpractice by employees of the defendant The Bristol Hospital Incorporated.[1] Following the jury's verdict in favor of the plaintiffs, the defendant moved for judgment notwithstanding the verdict and to set aside the verdict. The trial court denied these motions and rendered judgment in accordance with the jury's verdict. On appeal, the defendant claims that the court improperly denied (1) its motion for judgment notwithstanding the verdict and (2) its motion to set aside the verdict and order a new trial. We disagree and, accordingly, affirm the judgment of the trial court.

The following allegations from the plaintiffs' complaint underlie this appeal. Count one of the complaint alleged that Bruce Cockayne was admitted to the defendant on February 11, 2014, and, during this admission, he received treatments of a medication administered rectally via enema. During one or more of these treatments, his rectum was perforated. The plaintiffs alleged that this perforation was proximately caused by the carelessness and negligence of the defendant's agents, servants, or employees.[2] Further, the plaintiffs claimed that, due to this carelessness and negligence, Bruce Cockayne had to undergo numerous surgeries, procedures, diagnostic tests, therapies, and the administration of medications. These medical treatments caused him to suffer extreme physical and mental pain and suffering, to incur medical expenses and to have his ability to enjoy life's pleasures curtailed and diminished. Count two of the complaint set forth a loss of consortium claim on behalf of Marion Cockayne.[3]

Following the presentation of the evidence, the jury reasonably could have found the following facts. In January, 2014, Bruce Cockayne experienced symptoms of diarrhea and vomiting. At that time, he was admitted to the defendant for treatment consisting of bedrest, medication, and a colonoscopy. At this time, his rectum was described as "largely intact . . . ." Bruce Cockayne was discharged from the defendant on February 3, 2014. He was prescribed Rowasa enemas to be administered at home.[4] Marion Cockayne attempted to administer this type of enema to her husband but was unsuccessful due to his irritation and pain. During the time period of February 2 through 10, 2014, no foreign body was inserted into Bruce Cockayne's rectum.

On February 11, 2014, Bruce Cockayne was readmitted to the defendant after fainting, likely due to continued diarrhea and the resulting loss of fluids. At approximately 9:45 p.m. on February 11, 2014, and approximately 8 p.m. on February 12, 2014, Jordan Kaine, a nurse employed by the defendant, administered a Rowasa

enema to Bruce Cockayne in the course of her employment duties. At approximately 8 p.m. on February 13, 2014, Elaine Medina Lapaan, a nurse employed by the defendant, administered a Rowasa enema to Bruce Cockayne in the course of her employment duties.[5]

On the morning of February 14, 2014, Bruce Cockayne suffered a "massive rectal bleed" and was transferred to the intensive care unit. An embolization procedure successfully stopped the bleeding. Following a CT scan, Rainer Bagdasarian, a physician, operated on Bruce Cockayne and performed, inter alia, an endoscopy. During this procedure, Bagdasarian determined that an internal hemorrhoid located on the left lateral anal canal caused the bleeding.[6] Bagdasarian also discovered that, just past the end of the anal canal and distinct from the internal hemorrhoid, "there was a large, two centimeter, older appearing perforation in the posterior right rectum . . . ." Bagdasarian performed an ileostomy to divert feces away from the perforation and to prevent it from spilling into the perineum, the space outside of the rectum.[7] Despite this effort, Bruce Cockayne developed a necrotizing infection and his health deteriorated precipitously due to sepsis. He required numerous medical procedures at multiple facilities, including Hartford Hospital and Gaylord Hospital.[8]

On July 29, 2016, the plaintiffs commenced the present action against the defendant. Specifically, they claimed that the defendant was vicariously liable[9] for the negligence of its employees who perforated Bruce Cockayne's rectum during the course of an enema administration. The complaint also set forth Marion Cockayne's derivative claim for loss of consortium. A trial was conducted over several days in January, 2020. After the plaintiffs rested, the defendant moved for a directed verdict, claiming that the plaintiffs had failed to present an evidentiary basis (1) as to when the perforation of the rectum had occurred and, therefore, which of the defendant's employees, Lapaan or Kaine, had breached the applicable standard of care and (2) to support their claim that the tip of the Rowasa enema was long enough to cause the perforation. The court reserved its decision on the defendant's motion for a directed verdict and permitted the issues to be submitted to the jury.[10]

On January 24, 2020, the jury returned a verdict in favor of the plaintiffs. As to the medical malpractice claim alleged in count one of the complaint, the jury awarded Bruce Cockayne $382,732.21 in past economic damages and $2,105,027.16 in noneconomic damages. As to the loss of consortium claim alleged in count two of the complaint, the jury awarded Marion Cockayne $720,000.

On March 2, 2020, and in accordance with its prior motion for a directed verdict, the defendant filed a motion for judgment notwithstanding the verdict pursu-

ant to Practice Book §§ 16-35 and 16-37. That same day, the defendant also filed a motion to set aside the verdict and sought a new trial pursuant to Practice Book § 16-35. In two memoranda of decisions dated August 25, 2020, the court denied the defendant's postverdict motions. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the court improperly denied its motion for judgment notwithstanding the verdict. It contends that the plaintiffs presented insufficient evidence that either Kaine or Lapaan, the nurses employed by the defendant, negligently caused the perforation in Bruce Cockayne's rectum. Specifically, the defendant argues that the evidence, viewed in the light most favorable to the plaintiffs, failed to prove that (1) the Rowasa enema physically could have caused the perforation in the posterior of the rectum and (2) the defendant's employees negligently administered the enema. The plaintiffs counter that they presented sufficient evidence for the jury to find that the Rowasa enema perforated the rectum and that the perforation was caused by the negligence of one of the nurses in administering the enemas. We agree with the plaintiffs.

As a preliminary matter, we address the applicable standard of review. The parties do not agree on the standard of review with respect to the issues raised in this appeal. The plaintiffs argue that the abuse of discretion standard applies while the defendant contends that our review is de novo. We acknowledge that numerous cases from our appellate courts have referred to the abuse of discretion standard in the context of reviewing the decision of the trial court regarding a motion for judgment notwithstanding the verdict or a motion to set aside the verdict. See, e.g., *Landmark Investment Group, LLC* v. *CALCO Construction & Development Co.*, 318 Conn. 847, 862–63, 124 A.3d 847 (2015); *Ulbrich* v. *Groth*, 310 Conn. 375, 437, 78 A.3d 76 (2013); *Grayson* v. *Wofsey, Rosen, Kweskin & Kuriansky*, 231 Conn. 168, 178, 646 A.2d 195 (1994); *Lappostato* v. *Terk*, 143 Conn. App. 384, 408–409, 71 A.3d 552, cert. denied, 310 Conn. 911, 76 A.3d 627 (2013); *Macchietto* v. *Keggi*, 103 Conn. App. 769, 777, 930 A.2d 817, cert. denied, 284 Conn. 934, 935 A.2d 151 (2007). Nevertheless, we disagree with the plaintiffs that the abuse of discretion standard applies to the defendant's claims.

In the present case, the defendant has challenged the sufficiency of the evidence to support the jury's verdict in its motions for judgment notwithstanding the verdict and to set aside the verdict.[11] The standard for appellate review of the denial of a motion for judgment notwithstanding the verdict is well settled and mirrors the standard applicable to a motion for a directed verdict. "Directed verdicts are not favored. . . . A trial court

should direct a verdict only when a jury could not reasonably and legally have reached any other conclusion. . . . In reviewing the trial court's decision [to deny the defendant's motion for a directed verdict] we must consider the evidence in the light most favorable to the plaintiff. . . . Although it is the jury's right to draw logical deductions and make reasonable inferences from the facts proven . . . it may not resort to mere conjecture and speculation. . . . A directed verdict is justified if . . . the evidence is so weak that it would be proper for the court to set aside a verdict rendered for the other party. . . . The foregoing standard of review also governs the trial court's denial of the defendant's motion for judgment notwithstanding the verdict because that motion is not a new motion, but [is] the renewal of [the previous] motion for a directed verdict." (Citation omitted; internal quotation marks omitted.) *Bagley* v. *Adel Wiggins Group*, 327 Conn. 89, 102, 171 A.3d 432 (2017); see also *Haynes* v. *Middletown*, 314 Conn. 303, 311–12, 101 A.3d 249 (2014).

Our Supreme Court has applied the plenary standard of review when reviewing the propriety of a trial court's ruling on a motion for directed verdict based on a claim of insufficient evidence. In *Curran* v. *Kroll*, 303 Conn. 845, 855, 37 A.3d 700 (2012), the trial court granted the defendants' motion for a directed verdict on the basis that the plaintiff failed to present any evidence of a breach of the standard of care in a medical malpractice action. This court reversed the decision of the trial court, concluding that "the evidence presented by the plaintiff at trial would support a reasonable inference that [the defendant physician] had failed to warn the decedent adequately of the signs and symptoms associated with the risks of taking birth control pills." Id. The defendant then appealed to our Supreme Court. Id.

In affirming the decision of this court, our Supreme Court noted the following with respect to the standard of review used in its analysis: "Whether the evidence presented by the plaintiff was sufficient to withstand a motion for a directed verdict is a question of law, over which our review is plenary." Id.; see *MacDermid, Inc.* v. *Leonetti*, 328 Conn. 726, 744, 183 A.3d 611 (2018) ("[w]hether the evidence presented by the plaintiff is sufficient to withstand a motion for a directed verdict is a question of law" subject to plenary review, and " '[a] directed verdict is justified [only] if . . . the evidence is so weak that it would be proper . . . to set aside a verdict rendered for the other party' "); see also *Farrell* v. *Johnson & Johnson*, 335 Conn. 398, 416–17, 238 A.3d 698 (2020); *Pellet* v. *Keller Williams Realty Corp.*, 177 Conn. App. 42, 50, 172 A.3d 283 (2017). We conclude, therefore, that the proper appellate standard in the present case is plenary review.

We also note that "[t]wo further fundamental points bear emphasis. First, the plaintiff in a civil matter is

not required to prove his case beyond a reasonable doubt; a mere preponderance of the evidence is sufficient. Second, the well established standards compelling great deference to the historical function of the jury find their roots in the constitutional right to a trial by jury." (Internal quotation marks omitted.) *Procaccini* v. *Lawrence + Memorial Hospital, Inc.*, 175 Conn. App. 692, 716, 168 A.3d 538, cert. denied, 327 Conn. 960, 172 A.3d 801 (2017); see also *Millette* v. *Connecticut Post Ltd. Partnership*, 143 Conn. App. 62, 68, 70 A.3d 126 (2013). Indeed, our Supreme Court has recognized that circumstantial evidence, coupled with the reasonable inferences drawn therefrom, can support a finding of causation in a medical malpractice action. *Console* v. *Nickou*, 156 Conn. 268, 274–75, 240 A.2d 895 (1968). "The test of the sufficiency of proof by circumstantial evidence is whether rational minds could reasonably and logically draw the inference. . . . The proof need not be so conclusive that it precludes every other hypothesis. It is sufficient if the proof produces in the mind of the trier a reasonable belief that it is more probable than otherwise that the fact to be inferred is true." (Citations omitted; internal quotation marks omitted.) Id., 275.

Next, it is instructive to review the relevant legal principles pertaining to claims of medical malpractice. "[T]o prevail in a medical malpractice action, the plaintiff must prove (1) the requisite standard of care for treatment, (2) a deviation from that standard of care, and (3) a causal connection between the deviation and the claimed injury. . . . Generally, expert testimony is required to establish both the standard of care to which the defendant is held and the breach of that standard. . . . Likewise, [e]xpert medical opinion evidence is usually required to show the cause of an injury or disease because the medical effect on the human system of the infliction of injuries is generally not within the sphere of the common knowledge of the lay person." (Citations omitted; internal quotation marks omitted.) *Procaccini* v. *Lawrence + Memorial Hospital, Inc.*, supra, 175 Conn. App. 717–18; see also *Rosa* v. *Lawrence & Memorial Hospital*, 145 Conn. App. 275, 303, 74 A.3d 534 (2013); *Hammer* v. *Mount Sinai Hospital*, 25 Conn. App. 702, 717–18, 596 A.2d 1318, cert. denied, 220 Conn. 933, 599 A.2d 384 (1991).[12] We remain mindful, however, that the mere fact that an injury followed a medical procedure is insufficient to establish negligence. *Mozzer* v. *Bush*, 11 Conn. App. 434, 438 n.4, 527 A.2d 727 (1987); see also *Krause* v. *Bridgeport Hospital*, 169 Conn. 1, 8, 362 A.2d 802 (1975).

The defendant's appeal focuses on causation. "All medical malpractice claims, whether involving acts or inactions of a defendant . . . require that a [defendant's] . . . conduct proximately cause the plaintiff's injuries. *The question is whether the conduct of the defendant was a substantial factor in causing the*

*plaintiff's injury. . . .* This causal connection must rest upon more than surmise or conjecture. . . . *A trier is not concerned with possibilities but with reasonable probabilities. . . . The causal relation between an injury and its later physical effects may be established by the direct opinion of a physician, by his deduction by the process of eliminating causes other than the traumatic agency, or by his opinion based upon a hypothetical question. . . .*

"[I]t is the plaintiff who bears the burden to prove an unbroken sequence of events that tied his injuries to the [defendant's conduct]. . . . *A plaintiff, however, is not required to disprove all other possible explanations for the accident but, rather, must demonstrate that it is more likely than not that the defendant's negligence was the cause of the accident.*" (Citations omitted; emphasis altered; internal quotation marks omitted.) *Procaccini* v. *Lawrence + Memorial Hospital, Inc.*, supra, 175 Conn. App. 718–19; see also *Sargis* v. *Donahue*, 142 Conn. App. 505, 513, 65 A.3d 20, cert. denied, 309 Conn. 914, 70 A.3d 38 (2013).

To determine whether the plaintiff has carried his or her burden with respect to causation, "an expert opinion need not walk us through the precise language of causation . . . . *To be reasonably probable, a conclusion must be more likely than not. . . . Whether an expert's testimony is expressed in terms of a reasonable probability that an event has occurred does not depend upon the semantics of the expert or his use of any particular term or phrase, but rather, is determined by looking at the entire substance of the expert's testimony. . . .* [S]ee, e.g., *State* v. *Weinberg*, 215 Conn. 231, 245, 575 A.2d 1003 ([a]n expert witness is competent to express an opinion, even though he or she may be unwilling to state a conclusion with absolute certainty, so long as the expert's opinion, if not stated in terms of the certain, is at least stated in terms of the probable, and not merely the possible . . . ), cert. denied, 498 U.S. 967, 111 S. Ct. 430, 112 L. Ed. 2d 413 (1990); *Aspiazu* v. *Orgera*, 205 Conn. 623, 632–33, 535 A.2d 338 (1987) ([w]hile we do not believe that it is mandatory to use talismanic words or the particular combination of magical words represented by the phrase reasonable degree of medical certainty [or probability] . . . there is no question that, to be entitled to damages, a plaintiff must establish the necessary causal relationship between the injury and the physical or mental condition that he claims resulted from it . . .)." (Citations omitted; emphasis added; internal quotation marks omitted.) *Rosa* v. *Lawrence & Memorial Hospital*, supra, 145 Conn. App. 304; see also *Struckman* v. *Burns*, 205 Conn. 542, 554–55, 534 A.2d 888 (1987). Guided by these principles, we set forth a detailed description of the evidence produced at trial by the plaintiffs regarding causation.[13]

Lapaan's deposition testimony was read to the jury during the trial. Her full-time employment with the defendant commenced in November, 2012. During Bruce Cockayne's hospital admission in February, 2014, Lapaan was his "primary nurse." He was the only patient to whom she had ever administered a Rowasa enema, and this occurred at approximately 8:15 p.m. on February 13, 2014. Lapaan described the Rowasa enema as having a shorter tip than other types of enemas and noted that rectal perforation was a concern. She further stated that if the tip of the Rowasa enema was manipulated excessively, it potentially could cause damage.

Kaine testified that she began her employment with the defendant in August, 2013, following her graduation from nursing school. She administered her first unsupervised enema at approximately 9:45 p.m. on February 11, 2014, to Bruce Cockayne and her second at approximately 8 p.m. the next day. Kaine explained that the proper administration of a Rowasa enema required her to position the patient on his left side and bring the knees up to the chest. She would then guide the tip of the enema into the anus and anal canal, directing it toward the belly button of the patient. Kaine agreed that misdirecting the tip of the enema, or an excessive use of force, would constitute a violation of the standard of care.[14]

The plaintiffs' attorneys read the transcript of Bagdasarian's deposition testimony to the jury. Bagdasarian opined that an internal hemorrhoid caused the massive bleeding on February 14, 2014, and that this issue was distinct from the older rectal perforation, which was located "slightly deeper or higher" and on the opposite side. He further stated that the insertion of a foreign body, such as a Rowasa enema, into the rectum caused the perforation that resulted in the sepsis suffered by Bruce Cockayne, but he could not definitively identify the specific item that caused this injury.[15] Bagdasarian then noted the perforation likely occurred prior to February 14, 2014.

On the third day of the trial, the plaintiffs presented expert testimony from Mark Korsten, a physician board certified in internal medicine and gastroenterology.[16] Korsten stated that, as a part of his duties, he trained physicians in the proper administration of enemas and that this procedure or technique would apply to both physicians and nurses. He explained that if the patient has a hemorrhoid or tender skin, then a more cautious approach is warranted. Korsten noted that, if the inserted object comes into contact with the hemorrhoid, the patient may "strain" and alter the anatomy of the rectum, making the procedure "more difficult and maybe more dangerous." Korsten also testified that he located two medical articles that recognized the possibility of rectal perforation resulting from an enema.[17]

Korsten reviewed Bruce Cockayne's medical records from the defendant and Hartford Hospital, as well as various deposition testimony. He described the perforation as a "significant tear" located not very far into the rectum, just past the terminus of the anal canal. Korsten stated that the insertion of a foreign body constituted the most common cause of a rectal tear. He opined, to a reasonable degree of medical probability, that the tip of an enema caused the perforation.[18] He had seen this injury only when there had been a deviation from the standard of care in the administration of an enema.[19] The location of the perforation, the right posterior wall of the rectum, led Korsten to believe that the enema had been administered incorrectly. He rejected the possibility in this case that the perforation was caused by Crohn's disease.[20] Additionally, Korsten ruled out a colonoscopic injury as the cause of this perforation, as there would have been symptoms, such as intense pain, almost immediately.

Korsten agreed with the defendant's counsel that the tip of a Rowasa enema measured 1.75 inches. He further testified during cross-examination that the length of the anal canal ranges between 3 centimeters and approximately 5.3 centimeters and that there is approximately 2.5 centimeters per inch. He explained, therefore, that the length of the Rowasa enema, approximately 1.75 inches, could reach beyond the anal canal to the location of the perforation in Bruce Cockayne's rectum.[21]

During redirect examination, Korsten discussed the summary prepared when Bruce Cockayne was transferred from the defendant to Hartford Hospital. The physician who prepared that document opined that the perforation was caused by "aggressive enema" use. Korsten explained that this notation referred to excessive force employed in the administration of the enemas. He iterated that misdirection, excessive force, or some combination of the two, caused the perforation and constituted a violation of the standard of care.

The plaintiffs also presented expert testimony from Natalie Mohammed, a registered nurse, who had reviewed the medical records and certain deposition testimony. She testified that, assuming that the perforation had occurred on February 11, 12 or 13, 2014, and that the perforation resulted from improper positioning and/or excessive force during the administration of a Rowasa enema, it was her opinion, to a reasonable degree of medical probability, that there was a deviation from the standard of care. In providing this testimony, she expressly relied on Korsten's testimony regarding the issue of causation.

After the plaintiffs had rested, the defendant moved for a directed verdict. Specifically, the defendant's counsel argued that the jury lacked an evidentiary basis to determine (1) whether the Rowasa enema was long

enough to cause the perforation and (2) when the perforation occurred and, therefore, which nurse, Lapaan or Kaine, breached the standard of care. After hearing further argument from both parties, the court reserved its decision on the defendant's motion for a directed verdict. The jury subsequently returned a verdict in favor of the plaintiffs.

On March 2, 2020, the defendant filed a motion for judgment notwithstanding the verdict. It argued that "the only expert opinions presented at trial were that the existence of the perforation, standing alone, constituted negligence." The defendant further argued that "the plaintiffs did not provide any testimony or evidence that would have allowed the jury to determine that the Rowasa enema was long enough to reach the spot of the perforation." The plaintiffs filed their objection two weeks later.

On August 25, 2020, the court issued a memorandum of decision denying the defendant's motion for judgment notwithstanding the verdict. The court noted that Korsten's testimony established causation by ruling out other possible causes of the injury, such as a spontaneous perforation due to Crohn's disease or perforation from the colonoscopy or from the enema administered by Marion Cockayne. The court further relied on Korsten's testimony concerning the improper administration of the enemas, that either misdirection or excessive force, or a combination thereof, caused the perforation. Finally, the court concluded that the medical records, diagrams and other demonstrative evidence provided a sufficient basis for the jury to conclude that the Rowasa enema was of a sufficient length to have caused the injury in this case. "Viewing all of the evidence presented at trial, the court does not find that the verdicts were manifestly unjust because the jury mistakenly applied a legal principle or because there was no evidence to which the legal principles of the case could be applied. Rather, the court finds that the jury could reasonably and legally have reached the conclusion that it did. Consequently, the verdicts must stand."

On appeal, the defendant iterates its contention that the plaintiffs failed to meet their burden with respect to causation. Specifically, it argues that there was insufficient evidence that (1) the Rowasa enema could cause the perforation in the posterior of the rectum and (2) either of the defendant's employees negligently administered the enema. We will address each contention in turn.

A

The defendant first contends that the plaintiffs failed to produce sufficient evidence from which the jury reasonably could conclude that the Rowasa enema could have caused the perforation in the posterior of the rectum. Specifically, it argues that there was no expert

evidence presented that the Rowasa enema was of sufficient length or rigidity to have caused the perforation sustained by this specific individual. We are not persuaded.[22]

In its brief, the defendant asserts that the evidence at trial established that the tip of the Rowasa enema was 4.375 centimeters in length and that the average length of the anal canal is between 3.5 centimeters and 5 centimeters. "Therefore, if [Bruce] Cockayne's anal canal was anywhere near the long end of average, the tip of the Rowasa enema could not have reached beyond the anal canal into the rectum, let alone to the posterior of the rectum. And even if [Bruce] Cockayne had a shorter anal canal within that range, it is almost inconceivable that the soft, flexible tip of the Rowasa enema could have rounded the bend at the end of the canal and crossed the rectum to cause a two centimeter puncture in the posterior rectal wall." (Internal quotation marks omitted.) The defendant essentially argues that the plaintiffs were required to present evidence of Bruce Cockayne's specific anatomical measurements, rather than the average range.

During his testimony, Korsten described the perforation: "Well, it's considered to be a significant tear. It's a long tear. It was not very far into the rectum. It was just in an area where the anal canal had ended and just into the most terminal part of the rectum . . . ." He also stated that the improper administration of an enema could cause such a perforation. He had physically examined this type of enema. Korsten described the tip of the Rowasa enema as "not that flexible" and having "some stiffness to it." Korsten also opined that aggressive force had been used during the administration of the enemas during the hospitalization. He stated that the length of the anal canal ranged, on average, between 3 centimeters and 5.3 centimeters and, therefore, the tip of the enema, measuring 4.375 centimeters, could reach into the rectum, the location of the perforation in this case. Additionally, he noted that, "[i]n certain circumstances, the tip may well not bend the way you would like it to bend. It may get caught, snag itself, the tip may get snagged against the lining of the intestine and as you continue to push, it is definitely possible, if not likely, that this tool is strong enough to go through the rectum." In conclusion, Korsten stated that there was "no doubt" in his mind that the Rowasa enema was capable of causing the perforation suffered by Bruce Cockayne.

The defendant has failed to cite any authority for its assertion that the plaintiffs needed to provide specific evidence of Bruce Cockayne's actual anatomical measurements. This argument imposes a requirement on expert testimony and evidence beyond that found in our jurisprudence. "Expert opinions must be based upon reasonable probabilities rather than mere speculation

or conjecture if they are to be admissible in establishing causation. . . . To be reasonably probable, a conclusion must be more likely than not." (Internal quotation marks omitted.) *Peatie* v. *Wal-Mart Stores, Inc.*, 112 Conn. App. 8, 21, 961 A.2d 1016 (2009). The plaintiff is not required to disprove all other possible explanations. *Procaccini* v. *Lawrence + Memorial Hospital, Inc.*, supra, 175 Conn. App. 719. We iterate that an expert is not required to use talismanic words to show reasonable probability so long as it is clear that his or her opinion is based on reasonable probabilities, i.e., more likely than not, to establish that the opinion constitutes more than pure speculation. *Milliun* v. *New Milford Hospital*, 129 Conn. App. 81, 100, 20 A.3d 36 (2011), aff'd, 310 Conn. 711, 80 A.3d 887 (2013); see also *State* v. *Nunes*, 260 Conn. 649, 672–73, 800 A.2d 1160 (2002); *Gois* v. *Asaro*, 150 Conn. App. 442, 449–50, 91 A.3d 513 (2014).

The jury heard different expert opinions regarding whether the Rowasa enema could have caused the perforation and was tasked with determining which opinion to believe. See *Scott* v. *CCMC Faculty Practice Plan, Inc.*, 191 Conn. App. 251, 260, 214 A.3d 393 (2019). We emphasize that "[c]onflicting expert testimony does not necessarily equate to insufficient evidence. . . . Rather, [w]here expert testimony conflicts, it becomes the function of the trier of fact to determine credibility and, in doing so, it could believe all, some or none of the testimony of [an] expert. . . . It is axiomatic that in cases involving conflicting expert testimony, the jury is free to accept or reject each expert's opinion in whole or in part." (Citations omitted; internal quotation marks omitted.) *Procaccini* v. *Lawrence + Memorial Hospital, Inc.*, supra, 175 Conn. App. 721; see also *Ayres* v. *Ayres*, 193 Conn. App. 224, 246, 219 A.3d 894, cert. denied, 334 Conn. 903, 219 A.3d 800 (2019), and cert. denied, 334 Conn. 903, 219 A.3d 800 (2019); *Arroyo* v. *University of Connecticut Health Center*, 175 Conn. App. 493, 518, 167 A.3d 1112, cert. denied, 327 Conn. 973, 174 A.3d 192 (2017); see generally *Nash* v. *Hunt*, 166 Conn. 418, 426, 352 A.2d 773 (1974) (jurors not obliged to accept ultimate opinion of expert witness and if such witness is not found credible, jurors will reject his or her opinion regardless of whether they believe or disbelieve subordinate facts on which expert opinion is based; further, jurors must reject expert opinion to extent it is based upon subordinate facts which they determine are not proved). For these reasons, we conclude that the plaintiffs met their burden of producing sufficient evidence that the Rowasa enema was physically capable of causing the perforation in the present case, and, therefore, the defendant's arguments to the contrary must fail. See *Landmark Investment Group, LLC* v. *CALCO Construction & Development Co.*, supra, 318 Conn. 863 (trial court may grant motion for judgment notwithstanding verdict only if jury could not reasonably and

legally reach any other conclusion and "must deny such a motion 'where it is apparent that there was some evidence upon which the jury might reasonably reach [its] conclusion' ").

B

The defendant next argues that the plaintiffs failed to produce sufficient evidence from which the jury reasonably could conclude that either of its employees, Kaine or Lapaan, negligently administered the enema.[23] Specifically, it contends that the plaintiffs failed to present any affirmative evidence that either nurse negligently caused the perforation and that the use of a differential diagnosis is an improper method of establishing causation. We disagree.

The defendant's argument relies significantly on our decision in *Mozzer* v. *Bush*, supra, 11 Conn. App. 434. In that case, the plaintiff sustained a right ulnar neuropathy during a gall bladder operation. Id., 435. The plaintiff claimed that the surgeon and anesthesiologist negligently positioned her right arm during the surgery. Id. The plaintiff testified "that she had no knowledge of what had transpired in the operating room, and did not remember being positioned on the operating table." Id. During the trial, the plaintiff's first expert witness, a neurosurgeon, opined that her injury "was 'related in some way to her surgical procedure.' " Id. The plaintiff's second expert witness, an anesthesiologist, testified, in response to a hypothetical question, that, in his opinion, the injury had occurred during the surgery. Id., 435–36.

After the plaintiff rested, the trial court struck the testimony of the plaintiff's experts and granted the defendants' motions for directed verdicts. Id., 436. Specifically, the court determined "that the testimony of such expert witnesses was purely speculative . . . and [that] such testimony could not be used reasonably to support a verdict for the plaintiff . . . ." (Internal quotation marks omitted.) Id.

On appeal, the plaintiff claimed that the court erred in striking her experts' testimony after she had concluded her case. Id. We determined that this claim had not been raised before the trial court and was not plain error. Id., 437–38. Accordingly, we declined to address the merits of her claim regarding the timing of the trial court's decision to strike the expert testimony. Id., 438.

This court expressly has noted the limited applicability of *Mozzer*. For example, in *Samose* v. *Hammer-Passero Norwalk Chiropractic Group, P.C.*, 24 Conn. App. 99, 100, 586 A.2d 614, cert. denied, 218 Conn. 903, 588 A.2d 1079 (1991), the plaintiffs commenced a malpractice action against a business entity and two of its agents who were chiropractors. The jury returned a verdict in favor of the plaintiff with respect to one of the chiropractors and the business entity. Id., 101. On appeal, the defendants claimed that the trial court

improperly failed to direct a verdict in their favor on the basis that the plaintiff presented insufficient evidence to prevail. Id., 102. In rejecting this claim and affirming the judgment, we noted that there was evidence for the jury to find that the failure to take X-rays, coupled with a subsequent spinal manipulation of the seventy-six year old plaintiff, constituted a deviation from the applicable standard of care. Id., 103. The jury also heard evidence of causation from numerous witnesses regarding the degree of force and the type of spinal manipulation done on successive days to the plaintiff's back. Id., 104. One of the experts specifically identified which chiropractor ruptured the plaintiff's disc. Id.

In rejecting the defendant's reliance on *Mozzer* v. *Bush*, supra, 11 Conn. App. 434, we noted that the plaintiff in that case had presented no evidence as to what had occurred during her surgery and completely failed to identify any specific act of negligence by a particular person. *Samose* v. *Hammer-Passero Norwalk Chiropractic Group, P.C.*, supra, 24 Conn. App. 105–106. "[I]n contrast [to *Mozzer*], the plaintiff met his burden of presenting evidence as to what took place at the chiropractors' offices and who acted on him on the dates in question. *Mozzer* is thus distinguishable from [*Samose*] and does not control its outcome." Id., 106; see also *Amsden* v. *Fischer*, 62 Conn. App. 323, 331–32, 771 A.2d 233 (2001) (*Mozzer* was distinguishable and court properly denied motions for directed verdict and to set aside jury's verdict when plaintiff met his burden of proving what transpired during surgery and follow-up visits).

In the present case, the jury heard evidence that there was no perforation of Bruce Cockayne's rectum in January, 2014, that the most likely cause of the rectal perforation was the insertion of a foreign object, and that nothing had been inserted into Bruce Cockayne's anus or rectum following the attempted enema administration by Marion Cockayne until his February, 2014 hospitalization and the administration of enemas by the defendant's employees. The jury also heard expert testimony as to four possible causational events: (1) a colonoscopy, (2) Marion Cockayne's attempted administration of a Rowasa enema at the plaintiffs' home, (3) the nurses' administration of Rowasa enemas during Bruce Cockayne's February, 2014 hospitalization, and (4) a spontaneous tearing of the rectum as a result of Crohn's disease.

Korsten used a differential diagnosis to eliminate the colonoscopy, the attempted administration of the Rowasa enema at the plaintiffs' home, and the spontaneous tearing of the rectum as a result of Crohn's disease as the cause of the perforation. He opined that, to a reasonable degree of medical probability, a Rowasa enema administered during the February, 2014 hospitalization of Bruce Cockyne caused the perforation. Our

Supreme Court has defined a differential diagnosis as "a method of diagnosis that involves a determination of which of a variety of possible conditions is the probable cause of an individual's symptoms, often by a process of elimination. See, e.g., Stedman's Medical Dictionary (28th Ed. 2006) p. 531." *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, 297 Conn. 105, 114 n.13, 998 A.2d 730 (2010). It is clear, therefore, that the defendant's attempt to establish the type of evidentiary lacunae present in *Mozzer* v. *Bush*, supra, 11 Conn. App. 436, is unavailing. See, e.g., *Procaccini* v. *Lawrence + Memorial Hospital, Inc.*, supra, 175 Conn. App. 725–27 (causation in medical malpractice action may be proved by circumstantial evidence and expert testimony).

The defendant also argues that a differential diagnosis is not a valid means to establish causation. We disagree. A review of our case law reveals numerous examples that support the use of a differential diagnosis. For example, in *Sargis* v. *Donahue*, supra, 142 Conn. App. 513, this court indicated that a causal relationship between an injury and its later physical effects may be established by, inter alia, a physician's deduction by the process of eliminating other causes.

Decisions from our Supreme Court provide further guidance and support for the use of a differential diagnosis in establishing causation in a medical malpractice action. In *Milliun* v. *New Milford Hospital*, 310 Conn. 711, 714–16, 80 A.3d 887 (2013), the plaintiff, the conservator of an individual (the patient) who suffered from a rare neurological disease, filed an action against the defendant hospital for medical malpractice. Specifically, the plaintiff claimed that, while in the defendant's care, the patient experienced a calamitous, four minute respiratory event during which her rate of breathing fell to a rate of only two breaths per minute. Id., 715. Following this anoxic incident, the patient sustained severe injury to her cognitive functioning. Id., 715–16. The plaintiff alleged negligence on the part of the defendant for failing to monitor the patient, failing to respond to her respiratory distress, and administering medication known to cause respiratory distress when combined with another medication that the patient was taking. Id., 716.

The patient was evaluated and treated at the Mayo Clinic in Rochester, Minnesota. Id. Two of the physicians at the Mayo Clinic opined that the patient's cognitive impairment was caused by the anoxic incident and not her underlying neurological disorder. Id., 717. These physicians were among those disclosed as experts by the plaintiff, but the internal policies of the Mayo Clinic prevented the defendant from deposing these witnesses. Id., 718. The defendant requested that the court preclude the plaintiff from relying on the medical records of the treating physicians as to the issue of causation; the plaintiff countered that the medical

records of the treating physicians were sufficient to establish this element of her case. Id., 719. Ultimately, the trial court agreed with the defendant and granted its motion for summary judgment on the basis that the plaintiff had failed to establish the element of causation by expert testimony. Id., 722.

On appeal, our Supreme Court commenced its analysis by stating that causation may be established by a signed report of a treating physician in place of live testimony, so long as the defendant was afforded the opportunity to cross-examine the author of such a report. Id., 725–26. It then explained that an expert's opinion may be based on hearsay. Id., 727.[24]

After a careful review of the medical records, in which the Mayo Clinic physicians had considered the patient's medical history and had conducted their own testing and examinations, our Supreme Court concluded that these physicians had sufficient, reliable information to diagnose the patient and to determine the cause of her cognitive impairment. Id., 731–32. "The physicians ruled out [the patient's neurological condition] or some other neurodegenerative condition as the cause of those injuries and apparently concluded that the anoxic incident, as described, was the presumptive cause of [the patient's] cognitive deficits because such a causal relationship was consistent with the timing of the onset of symptoms, the symptoms manifested and the results of comprehensive examination and testing. *Such a deductive process is a proper method on which to base an opinion as to causation. . . . Although there may be other possible causes that the physicians did not consider, such matters go to weight, not admissibility.*" (Citations omitted; emphasis altered.) Id., 732–33; see also *Mancuso* v. *Consolidated Edison Co. of New York, Inc.*, 967 F. Supp. 1437, 1446 (S.D.N.Y. 1997) (critical to establishing specific causation is exclusion of other possible causes of symptoms, and this method of considering all relevant potential causes and eliminating alternative causes based upon physical examination, clinical tests and thorough case history is called differential diagnosis).

In *Klein* v. *Norwalk Hospital*, 299 Conn. 241, 243–44, 9 A.3d 364 (2010), the plaintiff was receiving intravenous antibiotics following an operation. A registered nurse employed by the defendant inserted a new intravenous line into his left arm, and, following this procedure, he experienced neurological deficits in his left hand. Id., 244–45. The plaintiff alleged that the defendant's employee committed medical malpractice by improperly inserting the intravenous line and causing an anterior interosseous nerve palsy. Id., 245.

The defendant disclosed an expert to testify that the plaintiff's condition was the result of Parsonage Turner Syndrome. Id. During the trial, the plaintiff's expert, who had not been disclosed as an expert on Parsonage

Turner Syndrome, was asked about it on direct examination. Id., 245–46. The court sustained the defendant's objection but allowed the plaintiff's expert to testify outside of the presence of the jury regarding his knowledge of this condition. Id., 246. The jury returned a verdict for the defendant, which the court accepted. Id., 247–48.

On appeal, the plaintiff claimed that the court improperly excluded his expert from testifying in front of the jury regarding Parsonage Turner Syndrome. Id., 249. Our Supreme Court, agreeing with the plaintiff, first observed that the disclosure of the plaintiff's expert indicated that he would testify on the issue of causation. Id., 251–52. This disclosure implicitly informed the defendant that the expert's testimony would include what did not cause the plaintiff's injury. Id., 252. Our Supreme Court discussed the expert's use of a differential diagnosis. Id. "In the present case, [the plaintiff's expert] was permitted to testify that, in his expert opinion, the plaintiff's alleged injury can only happen as a result of negligence as a result of deviating from the standard of care. To the extent that this conclusion was the result of [the plaintiff's expert's] differential diagnosis, it necessarily was based on his consideration and elimination of the other possible causes for the alleged injury, including the theory of causation advanced by the defendant. This court never has articulated a requirement that a disclosure include an exhaustive list of each specific topic or condition to which an expert might testify as the basis for his diagnosis; disclosing a categorical topic such as causation generally is sufficient to indicate that testimony may encompass those issues, both considered and eliminated, necessary to explain conclusions within that category." (Internal quotation marks omitted.) Id.

Our Supreme Court then considered whether the trial court's improper exclusion of the plaintiff's expert witness was harmful. Id., 254–56. It noted that the plaintiff's case presented, on the issue of causation, a choice between the plaintiff's theory of an errant intravenous needle stick and the defendant's theory of Parsonage Turner Syndrome. Id., 256–57. It also reasoned that the plaintiff's expert was the only physician who testified that the defendant, through its employee, had breached the standard of care. Id., 258. "Because that conclusion rested on a differential diagnosis of the plaintiff's alleged injury, that diagnosis and its component exclusions of other possible causes were uniquely important to the issue of breach, and accordingly, were not replicated by any other evidence at trial. The other expert testimony excluding Parsonage Turner Syndrome addressed only causation, and did not address the question of breach. . . . Additionally, it is significant, in our view, to consider that [the] excluded testimony [of the plaintiff's expert] also would have aided in establishing his credibility as an expert and the reliability of his

ultimate conclusions in the eyes of the jury. In other words, but for the trial court's improper exclusion, [the plaintiff's expert] could have explained not only that he had rejected the defense theory of Parsonage Turner Syndrome as a cause, but also why he had done so." (Citation omitted; footnote omitted.) Id., 258.

On the basis of these cases, we conclude that the use of a differential diagnosis in the present case was proper and sufficient to establish the plaintiffs' theory of causation; that is, that the defendant's employees caused the perforation suffered by Bruce Cockayne during his February, 2014 hospitalization.[25]

## II

The defendant next claims that the court improperly denied its motion to set aside the verdict and order a new trial. Specifically, it argues that the plaintiffs failed to present expert evidence that Lapaan negligently caused the perforation and, therefore, the jury improperly was permitted to consider a specification of negligence unsupported by the evidence. We are not persuaded by this claim.

On January 21, 2020, the defendant filed proposed jury interrogatories consisting of four questions. Questions one and two asked the jury to indicate whether the plaintiffs had proved that Kaine deviated from the standard of care in her treatment of Bruce Cockayne in 2014, and whether this deviation had caused the perforation.[26] Questions three and four repeated these inquiries with respect to Lapaan.[27] The plaintiffs objected to the defendant's proposed jury interrogatories on January 23, 2020.

On January 23, 2020, the plaintiffs and the defendant expressly indicated their satisfaction with the court's proposed jury charge.[28] The court then heard argument regarding the defendant's proposed jury interrogatories.[29] The defendant's counsel argued, inter alia, that the jury was required to find that at least one of its employees, Kaine or Lapaan, was negligent.[30] The court, in the exercise of its discretion,[31] denied the defendant's motion to submit interrogatories to the jury. It concluded that the proposed interrogatories were inconsistent with the agreed upon jury charge that used "and/or" language with respect to the culpability of Kaine and Lapaan and were unnecessary, given the separate nature of the two counts alleged in the plaintiffs' complaint.[32]

Subsequent to the jury's verdict, on March 2, 2020, the defendant filed a motion to set aside the verdict rendered in favor of the plaintiffs.[33] In the attached memorandum of law, the defendant argued: "It is . . . impossible to know whether the jury concluded that Kaine negligently caused the perforation or whether it concluded that Lapaan negligently caused the perforation. The only causation expert opinion presented to

the jury was from . . . Korsten, who testified that Kaine, not Lapaan, negligently caused the perforation. Thus, the jury could not have reasonably concluded that Lapaan negligently caused the rectal perforation." The defendant further contended that the general verdict rule[34] did not apply in this case, and the court could not presume that the jury had found that Kaine caused Bruce Cockayne's injury. It concluded: "The jury may have improperly concluded that Lapaan was negligent and that her negligence was the sole proximate cause of the perforation."

On March 16, 2020, the plaintiffs filed their objection to the defendant's motion to set aside the verdict. In its March 30, 2020 reply, the defendant emphasized that, "[e]ven if there was a sufficient basis to conclude that Kaine negligently caused the perforation, it is well established that, when the general verdict rule is inapplicable, a new trial is required if [the court concludes that] . . . any ground on which the jury could have based its verdict was improper." (Emphasis omitted; internal quotation marks omitted.) The court heard argument from the parties on July 20, 2020.

The court issued its memorandum of decision denying the defendant's motion to set aside the verdict on August 25, 2020. It noted its agreement with the plaintiffs' position that "it did not matter which nurse caused Bruce Cockayne's injuries because vicarious liability would [have] attach[ed] in either case." The court also explained that the plaintiffs' complaint consisted of a primary cause of action, medical malpractice, and a secondary, derivative cause of action, loss of consortium. "Notwithstanding the [defendant's] valiant attempts to cast the plaintiffs' claims as separate counts of negligence directed against the individual nurses, the plaintiffs did not allege separate and distinct causes of action against Nurse Kaine and Nurse Lapaan. Consequently, the plaintiffs' burden was to prove that either one or both of the nurses negligently perforated Bruce Cockayne's rectum during the course of an enema treatment causing him injury."[35]

The court concluded that the plaintiffs had presented sufficient evidence at trial to meet their burden to prevail on their claims. Specifically, it pointed to the following in its summary of the evidence: "Korsten testified that he did not know which of the two nurses caused the perforation, however, when pressed by [the defendant's] counsel he stated that, more likely than not, Nurse Kaine administered the enema that caused the perforation. Nurse Mohammed also testified that she could not determine which of the two nurses caused the perforation, but that the enema administered by Nurse Lapaan was the likely cause. . . . There was no dispute that both nurses had administered a Rowasa enema to Bruce Cockayne . . . ."

The defendant's claim here requires us to conduct a

bifurcated inquiry. First, we must determine whether the plaintiffs presented sufficient evidence to support a finding that Lapaan negligently caused the perforation. If we answer that question in the negative, then we proceed to a determination of whether the jury's verdict may stand.[36] If we conclude, however, that the plaintiffs presented sufficient evidence with respect to either nurse having caused the perforation, then this claim must fail.

In addressing the initial question regarding the sufficiency of the causation evidence, we emphasize that a court should not set aside a verdict if it is apparent that some evidence exists on which the jury might have reached its conclusion. *Rodriguez* v. *State*, 155 Conn. App. 462, 488, 110 A.3d 467, cert. granted, 316 Conn. 916, 113 A.3d 71 (2015) (appeal withdrawn December 15, 2015); see also *Gagliano* v. *Advanced Specialty Care, P.C.*, 329 Conn. 745, 754, 189 A.3d 587 (2018); *Macchietto* v. *Keggi*, supra, 103 Conn. App. 773. As we explained in part I of this opinion, our review of this claim is plenary. See also *Snell* v. *Norwalk Yellow Cab, Inc.*, 332 Conn. 720, 763, 212 A.3d 646 (2019) (where trial court's decision on motion to set aside verdict is premised on question of law, appellate review is plenary).

A detailed discussion of the causation evidence adduced during the trial regarding each of the defendant's nurses is necessary. Korsten testified that he was familiar with the administration of enemas as part of his medical practice. He also taught the proper administration of enemas to other medical professionals. After reviewing the relevant medical records, he reached the opinion that the perforation sustained by Bruce Cockayne was caused by an enema that had been administered improperly. During his cross-examination, Korsten indicated that either Kaine or Lapaan used excessive force, without realizing it, when administering the enema to Bruce Cockayne during his hospitalization. When asked which nurse "did not violate their nursing standard of care," he responded: "I can't tell you. I don't know." The defendant's counsel then inquired as to which nurse caused the perforation and, thus, violated the standard of care. Korsten responded: "It would be the nurse who said this was the first unsupervised administration of an enema that she had ever done. That would be the most likely person." Korsten then stated that Kaine, who administered enemas on February 11 and 12, 2014, was more likely than not to have violated the standard of care based on her inexperience. Although Korsten identified Kaine as being the person most likely to have caused the perforation, he could not state on which date it had occurred. When asked if he thought that Lapaan was not negligent and did not cause the perforation, Korsten responded: "Just— I previously said that, I believe, that I thought it was Kaine, not Lapaan."

During redirect examination, the following colloquy occurred between the plaintiffs' counsel and Korsten:

"Q. And [the defendant's counsel] asked you to identify which nurse you think was the most probable person to do it. That was the first time that question was ever asked of you, I assume.

"A. Yes.

"Q. Your opinion has been that one or both of them did it or maybe both of them did it themselves, but you feel now after reviewing that probably the most probable person is Jordan Kaine.

"A. Yes.

"Q. You're not excluding Ms. Lapaan, but it's most likely Jordan Kaine.

"A. If I had to choose, it was Jordan Kaine.

"Q. Regardless, it was one of the [defendant's] employees . . . .

"A. Yes."

During recross-examination, Korsten again stated that Kaine was more likely than Lapaan to have caused the perforation. Korsten, however, noted that it was not impossible for Lapaan to have caused the perforation.

Mohammed testified that she instructed other nurses on the proper administration of enemas. During cross-examination, she stated that she could not determine which nurse, Kaine or Lapaan, had administered the enema negligently and which had not. During further cross-examination, and in consideration of her deposition statements, Mohammed indicated that the February 13, 2014 enema, which was administered by Lapaan, caused the perforation. She later opined that Kaine's administrations of enemas on February 11 and 12, 2014, "contributed" to the perforation. At this point, the plaintiffs' counsel objected on the basis that Mohammed had not been disclosed as a causation expert. The court overruled this objection. Mohammed then explained that she could not state that Lapaan bore the sole responsibility for causing the perforation, rather the cumulative effect of three enemas on consecutive days caused the perforation to occur on February 13, 2014.

We conclude that the plaintiffs presented sufficient evidence for the jury to find that Lapaan caused the perforation. Korsten testified that the administration of an enema with excessive force caused the perforation. The plaintiffs presented evidence that Lapaan, in the course of her employment duties and care of Bruce Cockayne, administered an enema on February 13, 2014, during the time frame in which the perforation likely occurred. Korsten initially testified regarding his uncertainty as to which nurse, Kaine or Lapaan, caused the perforation. On specific cross-examination, how-

ever, he stated that Kaine was more likely to have caused the perforation. He later clarified, however, that he had not previously considered which nurse was more likely responsible and that, regardless, one of the nurses had caused the perforation. Viewing the totality of his testimony, we conclude that the jury could have determined that, in Korsten's view, Kaine was more likely to have caused the perforation, but he did not exclude Lapaan. Moreover, the jury was not required to accept any specific portion of Korsten's testimony. *Shelnitz* v. *Greenberg*, 200 Conn. 58, 68, 509 A.2d 1023 (1986) (jury was free to accept or reject expert opinion in whole or in part); *Marchell* v. *Whelchel*, 66 Conn. App. 574, 583, 785 A.2d 253 (2001) (same); see also *Fajardo* v. *Boston Scientific Corp.*, Conn. , , A.3d (2021) (*Ecker*, *J.*, concurring in part and dissenting in part). The jury, therefore, could have credited his testimony that the administration of an enema by Lapaan caused the perforation in this case and that such perforation was the result of negligence.

Mohammed's testimony also provided a sufficient basis for the jury to find that Lapaan caused the perforation. First, we note that, although the plaintiffs had disclosed her as an expert on the applicable standard of care for nursing, she testified at trial, in response to questions from the defendant's counsel, on the issue of causation. The defendant's counsel, during cross-examination, referred to Mohammed's deposition where she had opined that Kaine or Lapaan used an improper technique. The defendant's counsel then questioned Mohammed as to which nurse had been negligent and specifically inquired as to which administration of an enema had caused the perforation. Next, the defendant's counsel, again referring to her deposition, asked Mohammed about her opinion that the February 13, 2014 enema administration, performed by Lapaan, caused the perforation. Mohammed testified that she still held that opinion. After further questioning by the defendant's counsel, Mohammed "clarif[ied]" her testimony and stated that she could not determine which individual nurse "solely" caused the perforation.

As we previously stated, the jury was free to credit or reject any specific part of an expert's testimony. *Procaccini* v. *Lawrence + Memorial Hospital, Inc.*, supra, 175 Conn. App. 721; see also *Shelnitz* v. *Greenberg*, supra, 200 Conn. 68. Specifically, it could have credited Mohammed's opinion, as set forth in her deposition and in court, that Lapaan caused the perforation.

In its appellate brief, the defendant notes that the plaintiffs did not disclose Mohammed as a causation expert.[37] It was, however, the defendant that raised the subject of causation with her during cross-examination. Having initiated the topic with Mohammed during the trial, the defendant cannot now change course and

claim that such testimony was improper. "Our rules of procedure do not allow a [party] to pursue one course of action at trial and later, on appeal, argue that a path he rejected should now be open to him. . . . To rule otherwise would permit trial by ambuscade." (Internal quotation marks omitted.) *Ferri* v. *Powell-Ferri*, 317 Conn. 223, 236–37, 116 A.3d 297 (2015); see also *Szymonik* v. *Szymonik*, 167 Conn. App. 641, 650, 144 A.3d 457 (party cannot adopt one position at trial and then different one on appeal), cert. denied, 323 Conn. 931, 150 A.3d 232 (2016).

On the basis of our review of all testimony on the issue of causation, we conclude that the plaintiffs presented sufficient expert evidence for the jury to find that Lapaan caused the perforation of Bruce Cockayne's rectum. In considering the testimony from the plaintiffs' experts, the jury reasonably could have determined that there was a reasonable probability that Lapaan's conduct was a substantial factor in causing the perforation. On the basis of this evidence, the court properly denied the motion to set aside the verdict, and the defendant's claim that the jury improperly was permitted to consider a theory of negligence unsupported by the evidence must fail.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] In their complaint, the plaintiffs named both The Bristol Hospital Incorporated and Bristol Hospital and Health Care Group, Inc., as defendants. During its charge to the jury, the trial court explained: "While these defendants are separate legal entities, they shall be treated as one and the same for purposes of this trial. As I continue with these instructions, I will refer to both defendants collectively as the defendant or Bristol Hospital." For the sake of consistency, we will follow the approach taken by the trial court and refer to the two entities named in the plaintiffs' complaint as "the defendant" in this opinion.

[2] The complaint set forth the following: "[Bruce Cockayne's] injuries, losses and damages were proximately caused by the carelessness and negligence of [the defendant], by and through its agents, servants or employee[s], in one or more of the following ways, in that they:

"a. perforated [Bruce Cockayne's] rectum during the course of enema administration when, in the exercise of reasonable care, [his] rectum should not have been perforated;

"b. permitted an agent, servant or employee of the defendant to perform the administration of an enema when said person was inadequately trained and/or lacked the experience and knowledge to do so;

"c. permitted an agent, servant or employee of the defendant to perform the administration of an enema when the use of an enema was contraindicated by the condition of [Bruce Cockayne's] rectum;

"d. failed to discover in a timely manner the perforated rectum;

"e. failed to discover and repair the perforation in a timely manner;

"f. failed to appreciate the signs and symptoms of a perforated rectum during the course of [Bruce Cockayne's] admission; and/or

"g. failed to take appropriate measures in light of the signs and symptoms of a perforated rectum."

[3] See, e.g., *Ashmore* v. *Hartford Hospital*, 331 Conn. 777, 791–93, 208 A.3d 256 (2019) (loss of consortium claim involves recognition of intangible elements of domestic relations, such as companionship and affection); *Hopson* v. *St. Mary's Hospital*, 176 Conn. 485, 495–96, 408 A.2d 260 (1979) (recognizing claim of married person whose spouse has been injured by negligence of third party).

[4] The evidence at trial established that Rowasa enemas are used to administer a medication, mesalamine, to treat inflammation in patients with Crohn's

disease or inflammatory bowel disease.

[5] Before the plaintiffs called their first witness, the parties stipulated that the defendant employed Lapaan and Kaine, the nurses involved in the case, and that they acted within the scope of their employment at all relevant times. The court iterated this stipulation during its charge to the jury. See, e.g., *Krause* v. *Bridgeport Hospital*, 169 Conn. 1, 4, 362 A.2d 802 (1975); *Procaccini* v. *Lawrence + Memorial Hospital, Inc.*, 175 Conn. App. 692, 703 n.4, 168 A.3d 538, cert. denied, 327 Conn. 960, 172 A.3d 801 (2017).

[6] A brief description of the relevant anatomy is helpful. The sigmoid colon connects to the rectum at the rectosigmoid junction and the rectum connects to the anal canal at the anorectal line. The anal canal terminates at the anal orifice, where fecal matter is expelled from the body.

[7] An ileostomy has been defined as follows: "Establishment of a fistula through which the ileum [the longest portion of the small intestine] discharges directly to the outside of the body." Stedman's Medical Dictionary (27th Ed. 2000) p. 874.

[8] For example, Kristy Thurston, a board certified colorectal surgeon at Hartford Hospital, testified that, following Bruce Cockayne's transfer to Hartford Hospital, she and her colleagues placed a drain in the infected area and performed a limited colonoscopy to identify any rectal pathology contributing to that infection. Thurston also confirmed the presence of the perforation in Bruce Cockayne's rectum. She described his condition as a "life-threatening situation . . . ." Following his transfer to Gaylord Hospital for rehabilitation and wound care, Bruce Cockayne returned to Hartford Hospital for two additional surgeries. After a period of recovery, Thurston reversed the ileostomy on March 25, 2015.

[9] "Vicarious liability is based on a relationship between the parties, irrespective of participation, either by act or omission, of the one vicariously liable, under which it has been determined as a matter of policy that one person should be liable for the act of the other. Its true basis is largely one of public or social policy under which it has been determined that, irrespective of fault, a party should be held to respond for the acts of another." (Internal quotation marks omitted.) *Alvarez* v. *New Haven Register, Inc.*, 249 Conn. 709, 720, 735 A.2d 306 (1999).

In the present case, the vicarious liability of the defendant was premised on the doctrine of respondeat superior. See, e.g., *Ali* v. *Community Health Care Plan, Inc.*, 261 Conn. 143, 151, 801 A.2d 775 (2002); *2 National Place, LLC* v. *Reiner*, 152 Conn. App. 544, 557–58, 99 A.3d 1171, cert. denied, 314 Conn. 939, 102 A.3d 1112 (2014). "[T]he theory of respondeat superior attaches liability to a principal merely because the agent committed a tort while acting within the scope of his employment." *Larsen Chelsey Realty Co.* v. *Larsen*, 232 Conn. 480, 505, 656 A.2d 1009 (1995).

[10] See, e.g., *Procaccini* v. *Lawrence + Memorial Hospital, Inc.*, 175 Conn. App. 692, 704, 168 A.3d 538, cert. denied, 327 Conn. 960, 172 A.3d 801 (2017).

[11] It bears noting that our Supreme Court has instructed that, in this context, "[a] party challenging the validity of the jury's verdict on grounds that there was insufficient evidence to support such a result carries a difficult burden. In reviewing the soundness of a jury's verdict, we construe the evidence in the light most favorable to sustaining the verdict. . . . We do not ask whether we would have reached the same result. [R]ather, we must determine . . . whether the totality of the evidence, including reasonable inferences therefrom, supports the jury's verdict . . . . If the jury could reasonably have reached its conclusion, the verdict must stand." (Internal quotation marks omitted.) *Gagliano* v. *Advanced Specialty Care, P.C.*, 329 Conn. 745, 754, 189 A.3d 587 (2018).

[12] Pursuant to Practice Book § 13-4, the plaintiffs disclosed Mark Korsten, a physician board certified in internal medicine and gastroenterology, Bagdasarian, a physician board certified in surgery, and Natalie Mohammed, a registered nurse, as expert witnesses.

[13] As is frequently the case in medical malpractice actions, the defendant's experts disagreed with the opinions of the plaintiffs' expert, including on the matters relating to causation. See, e.g., *Grondin* v. *Curi*, 262 Conn. 637, 657 n.20, 817 A.2d 61 (2003); *Gilbert* v. *Middlesex Hospital*, 58 Conn. App. 731, 737, 755 A.2d 903 (2000). We have noted that "[c]onflicting expert testimony does not necessarily equate to insufficient evidence." (Internal quotation marks omitted.) *Dallaire* v. *Hsu*, 130 Conn. App. 599, 603, 23 A.3d 729 (2011). Furthermore, "[t]he existence of conflicting evidence limits the court's authority to overturn a jury verdict. The jury is entrusted with the choice of which evidence is more credible and what effect it is to be given." (Internal quotation marks omitted.) *Barrows* v. *J.C. Penney Co.*, 58 Conn.

App. 225, 230, 753 A.2d 404, cert. denied, 254 Conn. 925, 761 A.2d 751 (2000).

[14] Our law has recognized that, under some circumstances, a defendant medical provider can provide the evidence necessary with respect to the elements of a medical malpractice claim. In *Console* v. *Nickou*, supra, 156 Conn. 273–74, the defendant physician testified that, in the exercise of reasonable standards of care and skill, a suture needle should not be left in a patient's body in the course of repairing an episiotomy and such an occurrence would constitute a violation of the standard of care. Our Supreme Court concluded that the defendant himself, a qualified expert, could provide the necessary evidence to support the verdict in favor of the plaintiff with respect to her medical malpractice claim. Id., 274; see also *Allen* v. *Giuliano*, 144 Conn. 573, 574–75, 135 A.2d 904 (1957) (defendant physician admitted during cross-examination that cast cutter, if used properly, should not have caused lacerations on plaintiff's leg).

[15] Bagdasarian had indicated in his postoperative notes that "it is presumed that [Bruce Cockayne] may have had anal rectal trauma related to a traumatic enema insertion causing the bleeding episode [two] days ago, and perforation into the extraperitoneal space."

[16] Korsten defined gastroenterology as "the diagnosis and treatment of disorders of the gastrointestinal tract that can extend from the mouth to the anus and all organs that supply additional backup to the gastrointestinal tracts, such as the pancreas and the liver."

[17] The plaintiffs' expert on the nursing standard of care, Natalie Mohammed, also testified that she was aware of rectal perforations that occurred from enema administration during her career.

[18] One of the defendant's expert witnesses, Tricia Marie Ramsdell, a registered nurse, testified that, during her deposition, she had identified four possible causes for the perforation: first, the enema administrations performed by Kaine and Lapaan; second, the enema administration performed by Marion Cockayne; third, the colonoscopy performed in January, 2014; and fourth, a spontaneous tearing as a result of Crohn's disease. Joel Weinstock, the defendant's expert gastroenterologist, and Walter Longo, a colon and rectal surgeon, also identified similar concerns during their depositions. Both Weinstock and Longo opined that the likely causes for perforation were the colonoscopy or a spontaneous rupture resulting from Crohn's disease.

[19] Our Supreme Court has noted that, "in certain cases, it may be impossible to determine the precise cause of the injury even after extensive discovery. In those cases, the plaintiff's expert nevertheless may be able to opine, to a reasonable degree of medical certainty, that the injury would not have occurred in the absence of medical negligence. As a general matter, there is no reason why that opinion evidence would not be sufficient to survive a motion for a directed verdict." *Wilcox* v. *Schwartz*, 303 Conn. 630, 650, 37 A.3d 133 (2012).

[20] Korsten described Crohn's disease as an inflammatory bowel disease that presented in a "spotty" nature, as opposed to ulcerative colitis, which affects all parts of the colon.

[21] Natalie Mohammed, a registered nurse, also testified that the Rowasa enema, if inserted improperly, could have reached the posterior wall of the rectum to cause the perforation suffered by Bruce Cockayne.

[22] The defendant further contends that the jury could not use the statements of Bruce Cockayne's treating physicians as a basis to find that the Rowasa enema could have perforated his rectum and that the jury could not use the location of the perforation as a basis to find causation. As a result of our conclusions regarding the sufficiency of the other evidence, we need not address these contentions.

[23] As we noted in *Procaccini* v. *Lawrence + Memorial Hospital, Inc.*, supra, 175 Conn. App. 692, "[a] party challenging the validity of the jury's verdict on grounds that there was insufficient evidence to support such a result carries a difficult burden. In reviewing the soundness of a jury's verdict, we construe the evidence in the light most favorable to sustaining the verdict. . . . Furthermore, it is not the function of this court to sit as the seventh juror when we review the sufficiency of the evidence . . . rather, we must determine . . . whether the totality of the evidence, including reasonable inferences therefrom, supports the jury's verdict . . . . [I]f the jury could reasonably have reached its conclusion, the verdict must stand . . . ." (Internal quotation marks omitted.) Id., 716.

[24] Specifically, our Supreme Court stated: "Therefore, an expert's opinion is not rendered inadmissible merely because the opinion is based on inadmissible hearsay, so long as the opinion is based on trustworthy information and the expert had sufficient experience to evaluate that information so as

to come to a conclusion which the trial court might well hold worthy of consideration by the jury. . . . The fact that a physician's report includes hearsay statements, whether from a patient or someone else, would not bar the report's admission on that basis unless those statements were being offered for substantive purposes, i.e., the truth of the matter asserted." (Citation omitted; footnote omitted; internal quotation marks omitted.) *Milliun* v. *New Milford Hospital*, supra, 310 Conn. 727–28.

[25] The defendant devoted a portion of its appellate brief and oral argument to the doctrine of res ipsa loquitur. It posited that the trial court "essentially relied" on this doctrine in determining that the plaintiffs had met their burden of proving negligent conduct by the nurses. The defendant argued: "The trial court's reasoning, like Dr. Korsten's opinion, appears to be based on a res ipsa loquitur theory: the very fact that there was a perforation suggests that 'something was done improperly.' " The defendant further contends that the use of this doctrine was improper as a result of the plaintiffs' failure to plead this theory of negligence specifically.

"The doctrine of res ipsa loquitur, literally the thing speaks for itself, permits a jury to infer negligence when no direct evidence of negligence has been introduced. . . . The doctrine of res ipsa loquitur applies only when two prerequisites are satisfied. First, the situation, condition or apparatus causing the injury must be such that in the ordinary course of events no injury would have occurred unless someone had been negligent. Second, at the time of the injury, both inspection and operation must have been in the control of the party charged with neglect. . . . When both of these prerequisites are satisfied, a fact finder properly may conclude that it is more likely than not that the injury in question was caused by the defendant's negligence." (Internal quotation marks omitted.) *Boone* v. *William W. Backus Hospital*, 272 Conn. 551, 575–76, 864 A.2d 1 (2005).

We agree with the defendant that res ipsa loquitur must be pleaded specifically if a plaintiff intends to use that theory of negligence. See, e.g., *White* v. *Mazda Motor of America, Inc.*, 313 Conn. 610, 626–27, 99 A.3d 1079 (2014). We disagree, however, with the defendant that this doctrine was relied on by the plaintiffs or the trial court. As we have explained, the plaintiffs presented testimony from expert witnesses to establish causation, which included the use of a differential diagnosis. There was expert testimony presented to the jury ruling out certain events as having caused the perforation and identifying the specific act that did cause it. The negligence, in this case, was not inferred in the absence of direct evidence. Accordingly, we conclude that the defendant's contention that the plaintiffs could prevail only by relying on res ipsa loquitur, which was not part of this case, is unavailing.

[26] Questions one and two of the defendant's proposed jury interrogatories provided: "[1] Did the plaintiffs . . . prove by a fair preponderance of the evidence that Jordan Kaine, RN (an employee of [the defendant]) deviated from the prevailing standard of care for registered nurses in 2014 in her care and treatment of Bruce Cockayne? . . . If the answer to Question 1 is 'no,' then skip Question 2 and continue to Question 3. . . . [2] Did the plaintiffs . . . prove by a fair preponderance of the evidence that Jordan Kaine's deviation from the prevailing standard of care caused the rectal perforation? . . . If the answer to Question 2 is 'no,' continue to Question 3. If the answers to Questions 1 and 2 are 'yes,' complete the plaintiff's verdict form."

[27] Questions three and four of the defendant's proposed jury interrogatories provided: "[3] Did the plaintiffs . . . prove by a fair preponderance of the evidence that Elaine Lapaan, RN (an employee of [the defendant]) deviated from the prevailing standard of care for registered nurses in 2014 in her care and treatment of Bruce Cockayne? . . . If the answers to Questions 1 and 3 are 'no,' then enter a verdict in favor of the defendant . . . on the defendant's verdict form and skip Question 4. If the answer to Question 3 is 'yes,' continue to Question 4. . . . [4] Did the plaintiffs . . . prove by a fair preponderance of the evidence that Elaine Lapaan's deviation from the prevailing standard of care caused the rectal perforation? . . . If the answer to Question 4 is 'no,' then enter a verdict in favor the defendant . . . on the defendant's verdict form. If the answer to Question [4] is 'yes,' complete the plaintiff's verdict form."

[28] "In the absence of a challenge to the trial court's charge to the jury . . . that charge becomes the law of the case. . . . The sufficiency of the evidence must be assessed in light of that law of the case." (Citation omitted.) *Gagliano* v. *Advanced Specialty Care, P.C.*, 329 Conn. 745, 755, 189 A.3d 587 (2018).

[29] The plaintiffs' counsel also submitted proposed interrogatories but subsequently noted his agreement with the court's intention to not provide any interrogatories to the jury.

[30] Specifically, the defendant's counsel stated: "And so the interrogatories make it clear to the jury, you have to decide whether it's been proven by a preponderance of the evidence that Nurse Lapaan was negligent, and then separately answer whether the plaintiff has established by a preponderance of the evidence whether Nurse Kaine was negligent. And if that isn't provided to the jury, the danger is that they'll—they'll accept this theory from the plaintiffs' experts that it doesn't really matter if you don't know which one of them was negligent."

[31] "The trial court has broad discretion to regulate the manner in which interrogatories are presented to the jury, as well as their form and content." (Internal quotation marks omitted.) *Viera* v. *Cohen*, 283 Conn. 412, 450, 927 A.2d 843 (2007); see also Practice Book § 16-18 (judicial authority may submit written interrogatories to jury); *Earlington* v. *Anastasi*, 293 Conn. 194, 200, 976 A.2d 689 (2009) (it is within reasonable discretion of presiding judge to require or to refuse to require jury to answer pertinent interrogatories, as proper administration of justice may require).

[32] The following examples from the jury instructions provide the relevant context for the court's ruling on the defendant's motion to submit interrogatories. "In this case, the plaintiffs claim that Bruce Cockayne *was injured through the negligence of Nurses Jordan Kaine and/or Elaine Lapaan,* both of whom were employees of [the defendant]. . . . In order to establish liability, the plaintiffs must prove by a fair preponderance of the evidence that the *conduct of Jordan Kaine and/or Elaine Lapaan represented a breach of the prevailing professional standard of care* that I have just described.

\* \* \*

"In their complaint, the plaintiffs allege that [the defendant's] employees, *Nurses Kaine and/or Lapaan, breached the standard of care* applicable to registered nurses, and were, therefore, negligent in the care and treatment rendered to Bruce Cockayne and that either one or both of them perforated Bruce Cockayne's rectum during the course of an enema treatment. . . . The plaintiffs must prove that any injury or harm for which they seek compensation from [the defendant] *was caused by Nurses Kaine and/or Lapaan.*" (Emphasis added.)

[33] See General Statutes § 52-228b ("[n]o verdict in any civil action involving a claim for money damages may be set aside except on written motion by a party to the action, stating the reasons relied upon in its support, filed and heard after notice to the adverse party according to the rules of the court").

[34] "The general verdict rule operates to prevent an appellate court from disturbing a verdict that may have been reached under a cloud of error, but is nonetheless valid because the jury may have taken an untainted route in reaching its verdict. . . . Under the general verdict rule, if a jury [returns] a general verdict for one party, and [the party raising a claim of error on appeal did not request] interrogatories, an appellate court will presume that the jury found every issue in favor of the prevailing party. . . . Thus, in a case in which the general verdict rule operates, if any ground for the verdict is proper, the verdict must stand; only if every ground is improper does the verdict fall. . . . A party desiring to avoid the effects of the general verdict rule may elicit the specific grounds for the verdict by submitting interrogatories to the jury. Alternatively, if the action is in separate counts, a party may seek separate verdicts on each of the counts. . . .

"Our Supreme Court has held that the general verdict rule applies to the following five situations: (1) denial of separate counts of a complaint; (2) denial of separate defenses pleaded as such; (3) denial of separate legal theories of recovery or defense pleaded in one count or defense, as the case may be; (4) denial of a complaint and pleading of a special defense; and (5) denial of a specific defense, raised under a general denial, that had been asserted as the case was tried but that should have been specially pleaded." (Citations omitted; internal quotation marks omitted.) *Green* v. *H.N.S. Management Co.*, 91 Conn. App. 751, 754–55, 881 A.2d 1072 (2005), cert. denied, 277 Conn. 909, 894 A.2d 990 (2006). Additionally, the general verdict rule had been held to be inapplicable when the complaint contains several specifications of negligence of an interlocking nature that support only one theory of recovery and it would be too difficult to consider them separately. Id., 755–57; see also *Rodriguez* v. *State*, 155 Conn. App. 462, 486 n.16, 110 A.3d 467 (decisions of our Supreme Court repeatedly have held that "general verdict rule does not apply to different specifications of negli-

gence"), cert. granted, 316 Conn. 916, 113 A.3d 71 (2015) (appeal withdrawn December 15, 2015).

[35] In further support of its reasoning, the trial court expressly stated that the plaintiffs' theory of the case was that either one, or both, of the nurses improperly administered the enema. "The plaintiffs' position throughout the trial was that since this action was only brought against the nurses' employer, and it was stipulated that both nurses were acting within the scope of their employment, *it did not matter which nurse caused Bruce Cockayne's injuries because vicarious liability would attach in either case*." (Emphasis added.)

We note that the defendant's proposed interrogatories would have required the members of the jury to agree unanimously on which nurse, Kaine or Lapaan, had violated the standard of care and caused Bruce Cockayne's injuries. Such a requirement would have elevated the plaintiffs' burden to a standard not required by our jurisprudence.

To be sure, "[i]n this state it is required that jury verdicts be unanimous, requiring each juror to decide the case individually after impartial consideration of the evidence with the other jurors." (Internal quotation marks omitted.) *Monti* v. *Wenkert*, 287 Conn. 101, 114, 947 A.2d 261 (2008); see also Practice Book § 16-30. This unanimity requirement, as the trial court implicitly recognized, did not extend to a finding of which nurse bore the ultimate responsibility for the perforation. In other words, the jurors were not required to unanimously agree that it was either Kaine, Lapaan, or both, who had caused the perforation. The members of the jury simply needed to be in agreement that at least one of the nurses violated the standard of care and caused the injuries to Bruce Cockayne to find the defendant vicariously liable.

[36] We are mindful that "[t]he trial court should not submit an issue to the jury that is unsupported by the facts in evidence." (Internal quotation marks omitted.) *Gombos* v. *Aranoff*, 53 Conn. App. 347, 355, 730 A.2d 98 (1999); see also *Wager* v. *Moore*, 193 Conn. App. 608, 624, 220 A.3d 48 (2019). In light of this authority, if the pathway to a plaintiff's verdict was not supported by any evidence, a defendant would have a stronger appellate claim.

[37] In their disclosure of Mohammed as an expert witness made pursuant to Practice Book § 13-4, the plaintiffs indicated that she would "testify as to her review and analysis of the medical records of Bruce Cockayne, the depositions of the parties and witnesses and her opinions whether the [defendant] deviated from the standard of care and the results of said deviations."